# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
### May 1, 2002 Session

## STATE OF TENNESSEE v. WILLIAM PIERRE TORRES

**Appeal from the Court of Criminal Appeals**
**Criminal Court for Knox County**
**No. 56073    Ray L. Jenkins, Judge**

_____

### No. E1999-00866-SC-DDT-DD - Filed July 19, 2002

_____

The defendant, William Pierre Torres, was convicted of first degree murder by aggravated child abuse[1] for the killing of his son, fifteen- month-old Quintyn Pierre James Wilson. Following a sentencing hearing, the jury found two aggravating circumstances: (1) "the murder was committed against a person less than twelve (12) years of age and the defendant was eighteen (18) years of age, or older" and (2) "the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death."[2] Finding that these aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt, the jury imposed a sentence of death for the first degree murder conviction. The Court of Criminal Appeals affirmed both the conviction and sentence. The case was docketed and argued in this Court, and after carefully reviewing the record and the relevant legal authorities, we affirm the defendant's conviction of first degree murder. Because the trial court erred by giving the jury an instruction pursuant to Kersey v. State, 525 S.W.2d 139 (Tenn. 1975), rather than accepting the jury's report of a deadlock, the sentence of death is reversed and the case is remanded to the trial court for a new sentencing hearing at which the jury shall only consider the sentences of imprisonment for life without possibility of parole and imprisonment for life.

**Tenn. Code Ann. § 39-13-206(a)(1) Automatic Appeal; Judgment of the Court of Criminal Appeals Affirmed in Part; Reversed in Part; Case Remanded to the Trial Court**

FRANK F. DROWOTA, III, C.J., delivered the opinion of the court, in which E. RILEY ANDERSON, JANICE M. HOLDER, ADOLPHO A. BIRCH, JR., and WILLIAM M. BARKER, JJ., joined.

William C. Talman and Susan E. Shipley, Knoxville, Tennessee, for the appellant, William Pierre Torres

_____

[1]Tenn. Code Ann. § 39-13-202(a)(4)(1993) (Repealed).

[2]Tenn. Code Ann. §39-13-204(i)(1) and (5) (1991).

Paul G. Summers, Attorney General & Reporter; Michael E. Moore, Solicitor General; Amy L. Tarkington, Deputy Attorney General; Randall Eugene Nichols, District Attorney General; Robert L. Jolley, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Guilt Phase Proof**

The proof offered by the State at the guilt phase of this trial established that in June of 1994, twenty-five-year-old William Pierre Torres lived in an apartment in Knoxville with his girlfriend, Jasma Nishee Wilson, and the couple's two children: a daughter, Sharise Elizabeth, and the victim, fifteen-month-old Quintyn Pierre James Wilson.[3] Wilson and the defendant met seven or eight years earlier in New York City. Wilson and the children moved to Knoxville in May of 1993 and lived with her sister, Marion Carter, and her sister's boyfriend, Clayton Martin, Jr. In October of 1993, the defendant joined Wilson and their children, and in May of 1994, Wilson, the defendant, and their children moved into an apartment of their own. Wilson worked a day shift job at a grocery store. The defendant worked a night shift job with a janitorial service. The defendant cared for the children during the day while Wilson worked, and Wilson cared for the children at night while the defendant worked. This arrangement continued until Wilson placed the children in daycare in early June of 1994.

However, on the morning of June 29, 1994, Wilson awoke later than normal and did not have time to drop Quintyn off at daycare. Therefore, Wilson left for work at 8:30 a.m. leaving Quintyn, asleep in his crib, in the care of the defendant who had just returned home from his night-shift job.[4] Wilson recalled that the defendant had been unusually tired when he arrived home that morning and had fallen asleep in his clothes. Wilson had cared for Quintyn the previous evening while the defendant worked, and she said Quintyn was fine when she left, that he had no marks or bruises on him except a scar from an insect bite on the back of his knee and a birth mark on his back.

Later that day, between 12:15 and 12:30 p.m., Wilson testified that the defendant telephoned her at work, asked her to come home, and told her that Quintyn had fallen from his crib and was not breathing. Wilson rushed home immediately to find Quintyn lying very still on a bed in one of the apartment's bedrooms. When she learned the defendant had not sought medical assistance, Wilson called 911, but she became hysterical and was unable to communicate with the operator. The defendant took the telephone and reported that Quintyn had fallen from his crib and was not breathing. Following the instructions of the 911 operator, the defendant performed CPR on Quintyn, alternately breathing into the child's mouth and compressing his chest. Soon thereafter, the

---

[3]The record reflects that Quintyn was born March 7, 1993.

[4]The record does not indicate whether the defendant's other child, Sharise Elizabeth, also was left in his care that day.

ambulance arrived and transported Quintyn to East Tennessee Baptist Hospital while paramedics continued efforts to resuscitate him.

An officer with the Knoxville Police Department transported Wilson and the defendant to the hospital. The officer described Wilson as hysterical and the defendant as calm, but "a little bit upset." A nurse working in the emergency room when the couple arrived testified that Wilson was distraught, that she had her head on the chaplain's shoulder, crying softly, while the defendant appeared arrogant and unconcerned, remaining outside in the hall and refusing to give Quintyn's medical history to emergency room personnel. The defendant told medical personnel that "the baby had been crying, and he'd gone to fix him something to eat in the next room and while he was in there, that he heard a noise, and he went back and the baby–the side of the bed had come loose–a pin or screw had come out of the bed, and he'd fallen to the floor."

Dr. Todd Mitchell Rice, the physician on duty in the emergency room when the ambulance arrived at approximately 1:10 p.m., testified that Quintyn showed "no signs of life, no cardiac activity, no spontaneous breathing, no spontaneous movement of any kind." Efforts to resuscitate the child continued until 1:33 p.m. when he was pronounced dead. While attempting to resuscitate Quintyn, Dr. Rice noted "several very suspicious marks" on the child's body including a possible cigarette burn on the back of his knee[6] and an injury resembling a bite mark.[7] Dr. Rice also noted several bruises or abrasions, "some new and some not so new." The left side of Quintyn's face and scalp were extensively bruised and swollen. These bruises appeared to be the most recent injuries suffered by the victim; but bruises of varying ages were visible on the front of the child's left shoulder, on his upper back, including his left posterior shoulder and his right posterior chest, on his lower back and buttocks, in the area of his right hip and thigh, and in the area of his left groin and thigh.[8]

Dr. Rice admitted that some of the discoloration on the child's lower back and buttocks was consistent with a birthmark.[9] Dr. Rice maintained, however, that the other marks on the child's body were bruises and that the bruises on the child's back and chest were consistent with "someone grabbing the child and the ends of the fingers actually digging into the ribs of the child . . . as someone was shaking [him]." Dr. Rice also observed retinal hemorrhaging in both of Quintyn's

---

[6]Wilson, the child's mother, explained that this mark was a scar from an insect bite.

[7]Dr. Rice also found "suspicious scarring" around the outside of the child's anus indicating possible sexual abuse. When questioned by the police, the defendant adamantly denied sexually abusing his son. The results of the child's autopsy did not indicate that the victim had been sexually abused.

[8]Although he cautioned that dating bruises is an "extraordinarily inexact science," Dr. Rice nevertheless opined that the bruises on Quintyn's face, scalp, and upper back had been inflicted within twenty-four hours of the time the child was examined in the emergency room. The bruise on Quintyn's right hip and thigh could have been hours old or days old. The bruise on the child's left groin and thigh appeared two or three days old, and the remaining bruises appeared one or two days old, "maybe less."

[9]As stated, Wilson testified that the victim had a birthmark in this area of his body.

eyes indicative of "shaken baby syndrome," a condition occurring when a young child is vigorously and intensely shaken so that blood vessels on the surface of the brain rupture. Based upon his observations and examination, Dr. Rice opined that Quintyn's death was caused by a physical assault, specifically, violent shaking and a severe blow to the left side of his head. According to Dr. Rice, the child's injuries were not consistent with the child merely falling out of bed as the defendant initially reported.

Dr. Frances K. Patterson, a pathologist with the University of Tennessee Medical Center, described the findings she made on June 30, 1994, during Quintyn's autopsy. In addition to some older injuries that were "either healed or partly healed," Quintyn had a small laceration near his left eye. Multiple recently inflicted bruises were also visible on Quintyn's body: in his scalp, on his cheeks and face, his lower back, buttocks, lower left leg, and right thigh. Bruising on Quintyn's cheek in the shape of a hand print indicated that someone had struck the child "very hard." Dr. Patterson, like Dr. Rice, conceded that some of the discoloration on Quintyn's lower back and buttocks could have been birthmarks, and additionally, she noted that some of the bruising on the child's chest likely resulted from the administration of CPR. Regarding circular scarring on Quintyn's arms, legs, and upper back, Dr. Patterson testified that these healed or partially healed marks were "about the size of what you might expect a bite to look like, but we weren't, you know, positive." Other smaller healed or partially healed wounds appeared to be scarring from cigarette burns.

An internal examination revealed cranial and abdominal hemorrhaging. According to Dr. Patterson, Quintyn had suffered seven recent injuries: three abdominal hemorrhages and four separate injuries to the head, all of which appeared to result from "blunt-force trauma" consistent with the "use of a human hand" but not consistent with a fall. Dr. Patterson rejected the notion that CPR caused the head and abdominal injuries. Dr. Patterson opined that the cranial hemorrhaging had been caused by at least two, and probably four, very severe blows to Quintyn's head. Dr. Patterson said Quintyn's abdominal injuries were similar to seat belt injuries sustained by victims of automobile accidents, which involve a great deal of force. Dr. Patterson opined that the abdominal injuries had likely been caused by three separate blows, although she conceded that a single blow could have caused the injuries, "if someone with a very large fist" hit the child very hard or if someone struck the child with a baseball bat, "very, very hard." Dr. Patterson opined that the victim's death resulted from subdural and subarachnoid hemorrhages with close head injury to the brain.

Knoxville police officers began questioning the defendant about 4:11 p.m. on June 29. In his first statement, the defendant again claimed that Quintyn had fallen out of his crib. According to the defendant, Quintyn awoke around 11:30 a.m. to 12 p.m. The defendant changed his diaper, gave him a bottle, and left him in his crib. While preparing the child's cereal, the defendant heard a "rumble," ran into the child's room, and found Quintyn on the floor giving a "cry that he never had before." Quintyn screamed, cried, and made unusual breathing noises. Quintyn then became quiet, and the child's body stiffened, relaxed, and turned purple. The defendant carried the child into his daughter's bedroom and placed him on the bed. Quintyn continued to cry for a short time, but then

stopped crying and began to breath heavily. Quintyn appeared "weak" and was making "whining noise[s]." Realizing that "something was wrong," the defendant called Wilson to come home. According to the defendant, Wilson arrived about ten to fifteen minutes after he telephoned her. Although the defendant initially suggested that he had called 911 while awaiting Wilson's arrival, he later told the police that he had been frightened and panicked and falsely claimed that he had called 911 before Wilson reached home.[10] The defendant adamantly maintained that he did not realize Quintyn had stopped breathing prior to Wilson's arrival at the apartment. The defendant said that he attempted to administer CPR to Quintyn, following the direction of the 911 operator, by alternately breathing into the child's mouth and pushing on his stomach.

The defendant denied abusing Quintyn and gave various explanations for the bruises and marks on the child's body. Explaining the bruises, the defendant claimed that his mountain bike had fallen on Quintyn one or two weeks earlier and that Quintyn had fallen from his crib in the past because a screw which fastened the side of the crib to the frame frequently became loose, allowing the crib to fall. Explaining what appeared to be bite marks, the defendant said he and the child often would lightly bite each other while playing. The defendant also admitted that he had shaken his son immediately after the child fell out of his crib "to see what was wrong with him," but he denied shaking Quintyn violently or severely.

In a second interview beginning at 6:26 p.m., about two hours later, the defendant admitted that Quintyn did not fall from his crib and gave the following statement describing how his son received the injuries that ultimately resulted in his death:

> He was left with me you know, to take care of him. He was supposed to go to daycare center and I told them that, I told my girl I could handle him you know, because he cries a lot so I told them I could handle him, you know? And then she left him there. She left him with me. And she left. So I slept until about, I don't know what time and he, he got up and he, he woke up you know, crying. He had s--t in his, doo-doo in his pants so I changed him, gave him his milk and stuff and you know, he kept crying and I kind of losed [sic] it and you know, I shook him and let him know you know, it was alright, that I didn't know that I had harmed him. And you know, I guess when I saw that I had harmed him, I got kind of nervous and stuff like that and tried to do something but you know, I guess it was too late.

The defendant admitted that he picked the child up under his arms and shook him "about two times . . . front to back, just told him to, just relax" and "I didn't know I had harmed him or nothing until I seen what had happened." He said that his son was making gestures "like he was in pain or something" and stopped breathing either after Wilson returned home or "a little bit before that." The defendant blamed his failure to call 911 on nervousness, ignorance, and fear of going to jail, stating:

---

[10]Emergency 911 records revealed only one call from the defendant's address – the call made by Wilson at 12:43 p.m.

I just got nervous, you know? I didn't know what to do . . . I was nervous. All types of things just going through my head. I was going to jail, this that and the other. I didn't know what to do. All I could do was call her and tell her to come home.

The defendant explained that Quintyn would not stop crying that day because "his mother has him spoiled to death . . . . His mother has him spoiled. [I]f he sees anybody else, he'll start crying and doesn't want to be around nobody else but his mother. . . ." The defendant maintained that he did not intend to hurt Quintyn, stating:

I didn't mean to do nothing to my child. I didn't mean to hurt him, do nothing wrong to him, you know? I thought if I shook him you know, he'd be quiet and later on you know, while I go and make him his food. I didn't mean to hurt him or nothing.

The State offered two other witnesses. Clayton Houston Martin, Jr., the boyfriend of Wilson's sister, testified that he moved Quintyn's baby bed after the child died and that the bed was in good condition, with all the screws in place. Karlene Heck, a registered nurse employed by the Knox County Health Department who examined Quintyn on June 13, 1994, about two weeks prior to his death, testified that her records do not include any reference to injuries on the child. Heck explained that state law mandates that she report any suspicious injuries she observes.

Based upon this proof, the jury found the defendant guilty of first degree murder by aggravated child abuse. The trial proceeded to the sentencing phase on the first degree murder conviction.

**Sentencing Phase Proof**

The State presented no further proof in its case-in-chief at the sentencing hearing, relying upon the proof at trial to establish the aggravating circumstance,
(1)"the murder was committed against a person less than twelve (12) years of age and the defendant was eighteen (18) years of age, or older;" and (2) "the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(1) &(5).

The defendant presented several witnesses. The first was Dr. Peter B. Young, a psychologist who had performed a neuropsychological evaluation of the defendant in April and May of 1997. Dr. Young diagnosed the defendant as suffering from paranoid schizophrenia and concluded that the defendant was psychotic. Dr. Young conceded that the defendant did not exhibit the criteria for paranoid schizophrenia found in the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") and also conceded that the results of the Rorschach test did not support this diagnosis. While the defendant's score on the Minnesota Multiphasic Personality Inventory, Second Edition (MMPI II) supported the diagnosis of paranoid schizophrenia, the portion of the test designed to detect malingering indicated that the overall results had "questionable validity." Dr. Young also testified that the defendant had been hit in the head twice with a baseball bat and opined that there was a

"high probability of some negative effect" from these incidents. Dr. Young further testified that the defendant had difficulties in visual processing and abstract reasoning.

The social history taken by Dr. Young revealed that the defendant was born October 7, 1968, in New York City. His mother was Sonia Clark; his father's identity was unknown. Either while pregnant with the defendant or soon after his birth, Clark became involved with Wilfredo Torres, Sr., by whom she had a second son. Shortly after her second child's birth, Clark disappeared and the two children were left first with Wilfredo and then with Wilfredo's mother and stepfather. After the stepfather left, the two boys were raised by Wilfredo's mother, the defendant's de facto grandmother, and "things seemed to stabilize" until 1978, when his grandmother became ill with cancer and returned to Puerto Rico. The defendant cared for his grandmother during her illness, and according to Dr. Young, he "came to the attention of mental health authorities" in Puerto Rico in 1979 and 1980. After his grandmother's death in 1982, the defendant and his brother lived with the grandmother's husband, who seemed to have no interest in the boys and let them do whatever they wanted. Florencio Cirino, the defendant's pastor and neighbor in Puerto Rico during this time, testified that the grandmother's husband would lock the defendant out of the house and that he, Cirino, would feed the defendant when he was hungry. Cirino described the defendant as "a very nice boy" and said the defendant frequently attended church with the Cirino family and played with the Cirino children.

In June of 1983, according to Dr. Young, the defendant and his brother were sent to relatives in New York; and in 1984 the boys began living with Wilfredo Torres, Sr., again. During this time, the defendant and his brother pleaded guilty to sexually abusing Wilfredo's five-year-old son and were placed in a juvenile detention center. Upon release from the center, the two boys lived first with an uncle and then for two years with a foster parent, who took good care of them. When their foster parent died suddenly of a heart attack, the two young men were left on their own, and the defendant became involved in "the gangs and the violence that was going on in New York." In 1990 the defendant was convicted of possession of a firearm and sent to prison. Upon his release in 1992, the defendant became involved with Jasma Wilson, and within a year, the defendant, Wilson, and their children moved to Knoxville.

The defendant also presented testimony that he was a good prisoner. Deanna Lamb, an officer at the Knox County Jail, testified that, despite some write-ups, the defendant had been "a very good inmate" while in jail. On cross-examination Lamb agreed that the defendant had been involved in altercations with two other inmates and that an incident report had recently been filed concerning the defendant because he told a guard that "as soon as he gets life, he's going to set it off, . . . 'you know what I mean.'" Lamb also testified that, as a participant in the Legal Lives Program, the defendant spoke with junior high students about avoiding jail. On cross-examination, Lamb stated that she had seen nothing indicating that the defendant had any type of mental disease or defect.

Jurors watched a videotape of a local television news report on the Legal Lives Program. The defendant appeared in the news report and briefly described his participation in the Program.

A parent who had attended the Legal Lives Program testified that the defendant's remarks made a significant impression on the students.

Another witness, Judicial Commissioner Brenda Lindsay-McDaniel, testified that the defendant had served capably as a Spanish interpreter in at least thirty arraignments in Knox County and that he always had a good attitude and never complained, even when called upon in the middle of the night or at other inconvenient times. Lindsay-McDaniel described the defendant as articulate, very nice, and extremely polite. Like Lamb, Lindsay-McDaniel testified on cross-examination that she had never seen any indication that the defendant suffers from a mental illness or mental defect.

The State presented two witnesses in rebuttal. The first, Salvador Ruiz, was an inmate at the Knox County Jail who briefly shared a cell with the defendant. Ruiz testified that the defendant told him that the defendant was using the Legal Lives Program "to juke [i.e., mislead] the people, whoever was charging him." The defendant had also described himself to Ruiz as a "chameleon." The second witness, Dr. Sharon Arnold, a psychiatrist at the Helen Ross McNabb Center, testified that she had evaluated the defendant on November 13, 1997, for one hour and found no evidence that he was suffering from mental illness, including paranoid schizophrenia or psychosis. She confirmed that the DSM-IV is a standard diagnostic manual for mental health professionals and that the defendant did not exhibit the criteria listed in the DSM-IV as supporting a diagnosis of paranoid schizophrenia.

Based upon this evidence, the jury concluded that the State had proven the following two aggravating circumstances beyond a reasonable doubt: (1) "[t]he murder was committed against a person less than twelve (12) years of age and the defendant was eighteen (18) years of age, or older" and (2) "the murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death."[11] Finding that these aggravating circumstances outweighed mitigating circumstances beyond a reasonable doubt, the jury imposed a sentence of death for the first degree murder conviction.

The Court of Criminal Appeals affirmed both the conviction and sentence. Thereafter, the case was docketed in this Court, and an order was entered particularly requesting argument on seven issues.[12] Having fully reviewed the record, the briefs, and applicable authority, we affirm the defendant's conviction of first degree murder. However, the sentence of death is reversed and the case is remanded for a new sentencing hearing at which the jury shall only consider the sentences of life imprisonment and life imprisonment without possibility of parole.

## I. Sufficiency of the Indictment

The defendant alleges that the indictment charging him with first degree murder by aggravated child abuse is defective because the State failed to charge aggravated child abuse as a

---

[11] Tenn. Code Ann. §39-13-204(i)(1) and (5) (1991).

[12] See Tenn. Sup. Ct. R. 12.2

separate offense in a separate count of the indictment. The State contends that the Court of Criminal Appeals correctly rejected this issue. We agree. While the law in Tennessee generally permits dual convictions for felony murder and the underlying predicate felony,[13] we are not aware of, nor does the defendant point to, any authority requiring the prosecution to seek dual convictions. Not only is there no authority requiring the State to seek dual convictions, in this particular case, dual convictions likely would not have been permissible. In State v. Ducker, 27 S.W.3d 889 (Tenn. 2000), this Court noted that the general rule permitting dual convictions did not appear to apply to a statute nearly identical[14] to the statute under which the defendant was indicted and convicted, stating:

> a legislative intent to permit dual convictions and sentences for both felony murder
> and the predicate felony does not appear to be present under the reckless killing of
> a child provision in Tenn. Code Ann. 39-13-204(a)(4) (1994).

Id. at 893; See also State v. Godsey, 60 S.W.3d 759, 776 (Tenn. 2001) (confirming this analysis of the 1994 statute but holding that dual convictions are permissible under the 1995 statutory amendment which repealed Tenn. Code Ann. § 39-13-204(a)(4) and simply added aggravated child abuse to the list of felonies capable of supporting a conviction for first degree felony murder). This issue is without merit.

Moreover, the Court of Criminal Appeals correctly concluded that the indictment in this case provided adequate notice to the defendant of the charged offense. This indictment[15] tracks not only the language of the statute proscribing first degree murder by aggravated child abuse, Tenn. Code Ann. § 39-13-202(a)(4) (1993), but also the language of the relevant child abuse statutes, Tenn. Code Ann. § 39-15-401 and -402 (1993). Additionally, the indictment includes the name and approximate age of the victim and the month and year the offense was committed. This indictment fully satisfies constitutional and statutory notice requirements. See, e.g. State v. Wilson, 31 S.W.3d 189, 192 (Tenn. 2000); Ruff v. State, 978 S.W.2d 95, 100 (Tenn. 1998).

---

[13] State v. Godsey, 60 S.W.3d 759, 777 (Tenn. 2001); State v. Blackburn, 694 S.W.2d 934, 936 (Tenn. 1985).

[14] The only difference between the 1994 statute at issue in Ducker and the 1993 statute under which the defendant stands convicted is the 1994 statute increased the age of the child element from 13 to 16.

[15] The indictment specifically provided as follows:
> The Grand Jurors for the State of Tennessee, upon their oaths, present that William
> Pierre Torres, . . . heretofore, to-wit: On or about the __ day of June, 1994, in the
> State and County aforesaid, did unlawfully and recklessly kill QUINTYN PIERRE
> JAMES WILSON, a child under thirteen (13) years of age, said QUINTYN
> PIERRE JAMES WILSON'S death resulting from aggravated child abuse; that is,
> said defendant WILLIAM PIERRE TORRES, . . . knowingly and other than by
> accidental means treated QUINTYN PIERRE JAMES WILSON in such a manner
> as to inflict serious bodily injury on QUINTYN PIERRE JAMES WILSON and
> caused the death of QUINTYN PIERRE JAMES WILSON in violation of T.C.A.
> § 39-13-202 . . . .

## II. Constitutionality of Tenn. Code Ann. § 39-13-202(a)(4)

At the time this offense was committed, Tenn. Code Ann. § 39-13-202(a)(4) (1993 Supp.) proscribed first degree murder by aggravated child abuse as follows:

> A reckless killing of a child less than 13 if the child's death results from aggravated child abuse as defined by Tenn. Code Ann. § 39-15-402, committed by the defendant against the child.

Briefly summarized, Tenn. Code Ann. § 39-13-401 and -402 provided at the time this offense was committed, that a person is guilty of aggravated child abuse who knowingly, other than by accidental means, treats a child under eighteen years of age in such a manner as to inflict injury or neglects such a child so that the act of abuse results in serious bodily injury to the child. As in the trial court and the Court of Criminal Appeals, the defendant challenges the constitutionality of the murder by aggravated child abuse statute. We address each argument in turn.

### A. Vagueness

First, he asserts that the statute is unconstitutionally vague under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, § 8, of the Tennessee Constitution because it contains two conflicting culpable mental states. The defendant specifically complains that the statute simultaneously requires a "reckless" killing and "knowing" child abuse. The State responds that the Court of Criminal Appeals correctly held that the statute is not vague on its face or as it has been applied to the defendant's case. We agree.

Due process requires that a statute be sufficiently precise to provide both fair notice to citizens of prohibited activities and minimal guidelines for enforcement to police officers and the courts. State v. Burkhart, 58 S.W.3d 694, 697, 699 (Tenn. 2001); Grayned v. City of Rockford, 408 U.S. 104, 108-109, 92 S. Ct. 2294, 2298, 33 L. Ed.2d 222 (1972); Davis-Kidd Booksellers, Inc. v. McWherter, 866 S.W.2d 520, 532 (Tenn. 1993). The fair warning requirement, however, does not demand absolute precision in drafting criminal statutes, and, generally, a statute is unconstitutionally vague only "[i]f people of common intelligence must necessarily guess at the meaning of a statute and differ as to its application." State v. Boyd, 925 S.W.2d 237, 243 (Tenn. Crim. App. 1995); see also Burkhart, 58 S.W.3d at 697; Davis-Kidd Booksellers, Inc., 866 S.W.2d at 532. A party who engages in conduct that is clearly proscribed by the statute cannot successfully challenge the statute for vagueness. Burkhart, 58 S.W.3d at 699.

Applying these principles, we conclude that the defendant's constitutional challenge must fail. There is nothing inconsistent or vague about a statute which defines as first degree murder a reckless killing that is committed in the course of knowing aggravated child abuse. See State v. Roberson, 988 S.W.2d 690, 693 (Tenn. Crim. App. 1998), perm. app. denied, (Tenn. 1999). In fact, when analyzing the 1994 version of this statute in Ducker, this Court explained:

> The child murder statute criminalizes the reckless killing of a child less than sixteen
> if the child's death results from aggravated child abuse, which is the knowing

-10-

treatment or neglect of a child so as to cause injury or adversely affect the child's health. In other words, the more serious charge simply requires an additional element that, along with the knowing act of [aggravated] child abuse or neglect, the person consciously disregards a substantial and unjustifiable risk that death could occur.[16]

Ducker, 27 S.W.3d at 895 (emphasis added). The statute clearly defines first degree murder by aggravated child abuse as any death that results when a person knowingly treats a child under thirteen in a manner to inflict serious bodily injury and consciously disregards a substantial and unjustifiable risk that death could occur. This statute clearly provides more than ample fair warning to the defendant that his conduct was prohibited.

### B. Merger

The defendant also argues that the statute is unconstitutional because it permits imposition of the death penalty for a killing during the perpetration of a felony that is incidental to the killing. Construing this argument as a reference to the merger doctrine, the Court of Criminal Appeals rejected this assertion. We agree. Recently, this Court explained that the merger doctrine does not implicate any principle of constitutional law and instead

> developed . . . as a shorthand explanation for the conclusion that the felony-murder rule should not be applied in circumstances where the only underlying (or "predicate") felony committed by the defendant was *assault*. The name of the doctrine derived from the characterization of the assault as an offense that "merged" with the resulting homicide.

Godsey, 60 S.W.3d at 774, quoting People v. Hansen, 885 P.2d 1022, 1028 (Cal. 1994) (emphasis in original). Nonetheless, "[w]here a legislature explicitly states that a particular felony is a predicate felony for felony-murder, no merger occurs." Godsey, 60 S.W.3d at 775 (citations and internal quotations omitted). Here, as in Godsey, the General Assembly expressed an unmistakable intent to permit a conviction for first degree murder by aggravated child abuse. Under these circumstances, the merger doctrine does not preclude the conviction for first degree murder even though the victim's death resulted from aggravated child abuse. Godsey, 60 S.W.3d at 775. This issue is without merit.

---

[16]The definition of reckless at the time of the instant offense was identical to the definition of reckless in 1994. Specifically, the mental state of reckless was defined as follows:

> "Reckless" refers to a person who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint.

Tenn. Code Ann. § 39-11-302(c) (1993) & (1994).

### III.  Evidence of Old Injuries

The defendant also complains that during the guilt phase of the trial the State was allowed to introduce testimony and photographic evidence of healed scars and "old" bruises on the victim's body.  Relying on State v. Hale, 840 S.W.2d 307 (Tenn. 1992), the defendant says that the introduction of this evidence of prior abuse for which he had not been convicted deprived him of his constitutional right to due process under Article I, § 8, of the Tennessee Constitution and the Fifth and Fourteenth Amendments to the United States Constitution.  The defendant also contends that the admission of this evidence deprived him of his right to an impartial jury under Article I, §9 of the Tennessee Constitution.

The State responds that the Court of Criminal Appeals correctly held that this issue was waived when the defendant failed to contemporaneously object to the admission of this evidence and that the plain error doctrine does not apply because the record reflects that the defendant's failure to object was a tactical choice.  The State alternatively asserts that, even if the issue is evaluated on its merits, the defendant is not entitled to relief because the evidence was relevant and admissible under established Tennessee authority to demonstrate Quintyn's condition at the time of his death.

As the State points out, it is difficult to determine exactly what evidence the defendant is complaining about since he does not include specific references to the record and since he did not contemporaneously object to the admission of the evidence.   Dr. Rice, the emergency room physician, testified that he saw a "variety" of bruises on the victim, some new some not so new; an area that appeared to have been caused by a cigarette burn; another area "suspicious" for a bite mark; scarring around the anus; and an older bruise on the victim's thigh.  Dr. Patterson, the pathologist, referred to "some old scars . . . that looked like they were either healed or partly healed," healed circular wounds on the victim's arms and legs resembling bites and cigarette burns, and older bruises and an old scar on the victim's back and buttocks.

In any event, we agree with the Court of Criminal Appeals that this issue was waived and that consideration of this issue under the plain error doctrine is not appropriate because the record indicates that defense counsel waived this issue for tactical reasons.  See State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000).  As the intermediate court pointed out, the trial court conducted a pre-trial hearing at which the defense argued that a jury-out hearing should be held under Tenn. R. Evid. 404 before any evidence was admitted showing injuries inflicted on the victim on occasions other than the date of his death.  The State argued that this evidence was relevant to show that the victim's injuries were inflicted "other than by accidental means."  The trial court did not rule on the motion at the pre-trial hearing but specifically requested that the defendant renew the motion when the trial "got to that point."

Defense counsel did not renew the motion but instead cross-examined the physicians and other prosecution witnesses about these older injuries, apparently attempting to undermine the reliability of the medical testimony.  For example, Dr. Rice described a mark on the back of the victim's knee as resembling a cigarette burn, but the victim's mother said, during cross-examination

by defense counsel, that this mark was a scar from an insect bite. The victim's mother also said that the victim had a birthmark on his back and buttocks: the physicians had described these marks as bruises, although conceding they could be a birthmark. See Smith, 24 S.W.3d at 283 ("When the State places objectionable evidence before the jury and defense counsel inquires at length about the evidence on cross-examination, any error in admitting the evidence is generally cured.")

Defense counsel also repeatedly referred to these older injuries during closing argument. In so doing, defense counsel was attempting to convince the jury that the victim's mother, rather than the defendant, abused the child. Defense counsel pointed out the uncertainty of the physicians as to the precise timing of the fatal injuries and the discrepancy between the expert testimony, that some of the injuries were older, and the mother's testimony that the child had no bruises or injuries when she left for work on the morning of June 29, 1994.

In sum, the record indicates that the defense allowed this evidence to be admitted without objection so that the defense could later attempt to show both that the medical testimony was unreliable and that the victim's mother rather than the defendant committed this offense. Under such circumstances, the defendant will not be allowed to complain on appeal that the trial court erred in admitting the evidence. Smith, 24 S.W.3d at 284.

Our holding in this regard should not be construed as a determination that the evidence was not admissible. As the State asserts, there is Tennessee authority suggesting that the evidence was properly admitted. See Tenn. R. Evid. 401 and 403; See State v. Dubose, 953 S.W.2d 649, 653 (Tenn. 1997). The evidence did not show the identity of the person or persons causing these prior bruises and scars. The evidence generally described the victim's appearance when he was brought to the emergency room and generally explained the autopsy findings. The prosecution did not rely upon or emphasize this evidence to prove the defendant's guilt or the (i)(5) aggravating circumstance. Moreover, contrary to the defendant's assertion, Hale is not controlling or relevant to this evidentiary issue. In Hale this Court struck down the 1988 statute as unconstitutional because it required the jury deciding the defendant's guilt or innocence of first degree murder to also decide the defendant's guilt or innocence of uncharged misdemeanor offenses. The statute under which the defendant was convicted did not require or allow the State to offer prior instances of uncharged misdemeanor offenses to establish guilt of first degree murder.

### IV. Erroneous Exclusion of Videotape: Harmless Error

During the guilt phase of the trial Investigator Ron Humphrey of the Knoxville Police Department testified for the State about two separate statements the defendant gave to law enforcement authorities. The audio tape recordings of these statements were played for the jury. As previously noted, in the first statement the defendant claimed that Quintyn had fallen from his crib while in the second statement, given almost two hours later, the defendant admitted that he had shaken the child. During cross-examination, defense counsel asked Humphrey about other interviews with the defendant and if any video interrogation had been done. The State objected that the defense was improperly referring to the defendant's videotaped polygraph examination, which had been suppressed. The defense, however, indicated that it was referring to a video, redacted to

avoid any mention of the polygraph test, depicting a separate interrogation, not yet presented to the jury, that occurred after the polygraph examination but before the second interview.[17] The defense argued that the tape was relevant to the jury's assessment of the weight to be given the defendant's second statement and to show how the defendant was "coerced and pushed into making [the] last statement" and that information about this interrogation was necessary under the rule of completeness. The State responded that, if part of the tape was admissible, then the rule of completeness required the admission of the entire tape including the polygraph test. The State alternatively argued that the tape was inadmissible because it contained only self-serving and irrelevant hearsay.

Refusing the defendant's request to view the tape before ruling on its admissibility, the trial court allowed the redacted and unredacted tapes to be introduced for identification only and forbade the defense from asking Humphrey general questions about talking with the defendant on occasions other than the two interviews already admitted. The trial court, however, permitted the defendant to ask whether Humphrey had ever made specific statements to the defendant. Humphrey testified that he did not recall making any such statements.[18]

The redacted videotape shows officers making statements to the defendant similar to those that Humphrey denied recalling when asked on cross-examination. In general, the tape shows the officers assuring the defendant that they did not believe he had intentionally harmed his child, that the evidence indicated it had been an accident, that if he told the truth he likely would be able to avoid the death penalty, that the officers would inform the district attorney general and the judge

---

[17]The record reflects four separate encounters between the defendant and police: (1) defendant's initial statement at 4:11 p.m. denying any wrongdoing; (2) defendant's voluntary polygraph examination; (3) an interview after the polygraph exam; and (4) defendant's second statement at 6:26 p.m. admitting that he had shaken Quintyn.

[18]The following exchange occurred after the trial court's ruling:

| | |
|---|---|
| Defense counsel: | Detective, you told Mr. Torres that you would call the District Attorney on his behalf if he would just say that he shook this child. |
| Humphrey: | I don't recall ever saying that. |
| Defense counsel: | You don't recall ever saying that? |
| Humphrey: | I do not recall ever saying that. |
| Defense counsel: | And you told Mr. Torres that all the evidence was that this was an accident. |
| Humphrey: | That's - - I don't believe that's in my statement that I have here. I don't recall saying that. This is a case that you're taking something out that I have a copy of. |
| Defense counsel: | In fact, you - - you told Mr. Torres that you didn't want him to spend the rest of his life in prison. |
| Humphrey: | Again, I don't ever recall ever saying that to Mr. Torres. |
| . . . . | |
| Defense Counsel: | In fact, at one point, you told Mr. Torres, "I don't think you intended to kill him. Nobody here does." |
| Humphrey: | Again, Ms. Shipley, I don't recall saying that to Mr. Torres. |
| Defense counsel: | You're not denying that you said it, though, are you? |
| Humphrey: | I'm not saying that I didn't say it; I'm not saying I did say it. I said I do not recall if I ever said that to him. |

Following this exchange, defense counsel concluded her cross-examination of the investigator.

of the defendant's remorse and cooperation, and that cooperation would be the defendant's "salvation." The defendant appeared to be crying through much of the interview. He asserted that he never intended to harm Quintyn and that he was fearful of going to prison for the rest of his life. The defendant expressed skepticism at the officer's offers of help, saying he had prior experience with the criminal justice system in New York. Eventually, the defendant agreed to provide another statement to the police, and the videotape concludes with the group leaving for another office to record the defendant's statement.[19]

The defendant contends that the court's ruling that the redacted tape was inadmissible was erroneous for three reasons. First, he says that the trial court erred by refusing to review the videotape before ruling it inadmissible and by denying the defense request to make an offer of proof. Relying upon Tenn. R. Evid. 103, the defendant asserts that "mere summaries" are disfavored, that the proof itself should be presented in a legitimate proffer, and that the trial court could not have made a full and fair ruling without viewing the tape or having a more detailed description of its contents. The State responds that the trial court was entitled to rely on the verbal summary of the videotape provided by the parties' during the jury-out hearing and that the trial court was not required to review the tape before ruling on its admissibility. The Court of Criminal Appeals held that the question of whether the trial court erred in refusing to view the tape before ruling was "necessarily submerged in the question of whether the trial court properly excluded the recording" and therefore did not rule on this question.

As the defendant correctly points out, generally, an offer of proof should be allowed, and refusing to allow an offer of proof generally is considered error. Tenn. R. Evid. 103 (a)(2) and (b); State v. Alley, 882 S.W.2d 810, 815 (Tenn. Crim. App. 1994). An offer of proof serves two primary purposes: (1) informing the trial court about the proof the party is seeking to offer; and (2) creating a record so that an appellate court can review the trial court's decision. Alley, 882 S.W.2d at 815. The second purpose clearly has been satisfied in this case. The redacted and unredacted videotapes are included in the record on appeal. As to the first purpose, the record indicates that the parties verbally summarized the nature of the evidence on the videotape. Given the apparent confusion as to the context and timing of the interview on the videotape,[20] however, the trial court probably would have been better situated to make an informed ruling on the admissibility had he reviewed the videotape rather than relying upon the verbal summaries. Nevertheless, we agree with the Court of Criminal Appeals that the failure of the trial court to view the videotape is not dispositive but

---

[19]The officers may not have been aware that this encounter was being recorded by the video camera. This interview occurred in the room where the defendant had voluntarily taken a polygraph examination. The defendant and the examiner left that room for a short time. When they returned, the examiner advised the defendant that he had failed the examination. Investigator Humphrey and another officer soon joined the defendant and the examiner. The approximately thirty minute interview that followed was recorded, and it was this interview that the defense sought to introduce.

[20]At one point the trial court asked, "So you have three separate – at this point, you have three separate statements, only two of which have been introduced by the State?"

rather is intertwined with the primary issue – the propriety of excluding the redacted videotape. While reviewing videotape evidence before ruling on its admissibility is the better practice, the defendant in this case is not entitled to relief simply because the trial court failed to do so.

With respect to the primary issue of admissibility, the defendant contends that the redacted tape should have been admitted under the "rule of completeness," found in Tenn. R. Evid. 106 which provides:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

The Court of Criminal Appeals agreed, finding that the interview on the tape and the second statement were "one continuous period of interrogation by police," even though the interrogation occurred in different rooms, different officers participated, and different means were used to record the interview. The Court of Criminal Appeals held that the redacted video, in large part, would have been "ultimately" admissible during the defendant's case-in-chief upon proper authentication of the recording to demonstrate the coercive atmosphere surrounding the defendant's second statement; to allow the jury to assess the reliability and credibility of the confession under Crane v. Kentucky, 476 U.S. 683, 106 S. Ct. 2142, 2145-2147, 90 L. ED. 2d 636 (1986); and to explain or qualify the confession. The Court of Criminal Appeals, however, held that the defendant was not entitled to relief because he had not taken whatever action was reasonably available to prevent or nullify the harmful effect of the error and alternatively, because, in light of the evidence at trial, the error did not appear to have affirmatively affected the jury's verdict. See Tenn. R. App. P. 36(b); Tenn. R. Crim. P. 52(a).

In this Court, the State concedes that the Court of Criminal Appeals correctly held that the trial court erred in excluding the videotape. The State argues, however, that the Court of Criminal Appeals also correctly concluded that the error does not entitle the defendant to relief because he did not attempt to prevent, nullify or ameliorate the harmful effect of the error and because, given the evidence, the error was harmless.

Like the Court of Criminal Appeals, we conclude that the trial court erred in excluding the redacted videotape. As the intermediate appellate court determined, the interview on the tape and the second statement were "one continuous period of interrogation by police," even though the interrogation occurred in different rooms, different officers participated, and different means were used to record the interview. The defendant was entitled to introduce the redacted videotape to demonstrate the circumstances surrounding the defendant's second statement and to allow the jury to assess the reliability and credibility of the confession. See, e.g., State v. Burns, 29 S.W.3d 40, 48 (Tenn. Crim. App. 1999) ("We recognize the longstanding rule in Tennessee that once a confession is admitted into evidence, a jury may hear evidence concerning the circumstances under

which the confession was procured in order to determine whether the defendant made the confession and whether it is true.").

Moreover, as this Court recently explained, Tenn. R. Evid. 106, the rule of completeness, reflects a concern for fairness and allows the trier of fact to assess related information at the same time rather than piecemeal. State v. Keough, 18 S.W.3d 175, 182-83 (Tenn. 2000). "[W]here the prosecution introduces a statement made by the defendant, the trial court may in the interest of fairness order that the remainder of the statement be admitted as well under Rule 106." Id. at 182; See also Crane v. Kentucky, 476 U.S. 683, 106 S. Ct. 2142, 2145-2147, 90 L. Ed. 2d 636 (1986); State v. Robinson, 622 S.W.2d 62, 71 (Tenn. Crim. App. 1980); Espitia v. State, 288 S.W.2d 731, 733 (Tenn. 1956).[21]

Nonetheless, after carefully reviewing the record in this case, we have no hesitation in concluding that the error was harmless as to the guilt-innocence stage of the proceeding. The evidence of the defendant's guilt is overwhelming. Nothing on the videotape even remotely implies that the defendant was innocent of the crime. Accordingly, as to guilt, we conclude that the error was harmless.

The effect of this erroneous ruling on the sentencing phase of the trial is a much closer question. The State offered proof and argued at sentencing that the defendant appeared arrogant, uncaring, and unremorseful about the victim's death. The excluded videotape, showing the defendant crying and stating that he did not mean to hurt his son, arguably tells a different tale.[22] The jury did not see this video, but still deliberated seven hours before returning a sentence of death. Clearly, had the trial court not erroneously excluded the videotape when the defense sought its admission, the jury could have considered it at sentencing. Nonetheless, the State argues that this issue is waived because the defense did not seek to introduce the videotape at the sentencing hearing.

We need not address this waiver argument or determine whether the erroneous exclusion of the videotape prejudiced the defense at sentencing. As hereafter explained, we conclude that the defendant is entitled to a new sentencing hearing because the trial court erred in giving a Kersey instruction rather than accepting the jury's report of a deadlock. At the new sentencing hearing, defense counsel may introduce the redacted videotape.

---

[21] In so holding, we also agree with the Court of Criminal Appeals' determination that the results of the polygraph test and the circumstances surrounding the taking of that test which preceded the interview on the videotape were not admissible into evidence. Polygraph results are inherently unreliable and inadmissible. See State v. Hartman, 42 S.W.3d 44, 61-62 (Tenn. 2001).

[22] At oral argument the State conceded that this Court can consider the videotape in conducting its proportionality review; however, the State minimized the videotape's importance to the sentencing jury, commenting that the jury does not make a finding on remorse. While that statement is undoubtedly true - the jury does not make a finding on remorse – a sentencing jury may consider remorse as a mitigating circumstance in determining whether death is the appropriate punishment.

## V. Kersey Instruction

The defendant next asserts that the trial court erred during the sentencing phase of his trial by instructing the jury in accordance with Kersey v. State, 525 S.W.2d 139 (Tenn. 1975). Specifically, the defendant maintains that, when a jury is undecided concerning the imposition of a sentence of death, Tenn. Code Ann. § 39-13-204(h) precludes the giving of a Kersey charge and requires the trial court instead to instruct the jury to choose between the punishments of life imprisonment without possibility of parole and life imprisonment. Even assuming the statute does not generally prohibit the giving of a Kersey charge, the defendant asserts that the instruction was unduly coercive given the circumstances of this particular case.

The State responds that Tenn. Code Ann. § 39-13-204(h) does not prohibit the giving of a Kersey instruction and only requires the trial court to remove the death penalty from the jury's consideration when the jury cannot "ultimately" agree on the imposition of the death penalty. The State asserts that the statutory provision affords trial courts the discretion to determine whether "there is an ultimate disagreement on punishment." Additionally, the State disagrees with the defendant's assertion that the instruction was coercive in this case, arguing that "[n]othing in the Kersey instruction is directed at the minority, nor does it force any person to abandon his or her convictions."

We begin our analysis of this issue with Kersey in which this Court reconsidered the "dynamite" charge that previously had been approved in Tennessee. After, deliberating for sometime, the jury in Kersey reported that it "had not reached a verdict and (i)t looks like we are not going to." 525 S.W.2d at 140. The trial court inquired and was advised by the foreperson that the jury was split on the question of guilt or innocence eleven to one. Id. At this point, the trial court provided the following instruction:

> While the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of your fellows, yet you should examine the questions submitted with candor and with a proper regard and D[eference] to the opinions of each other. It is your duty to decide the case if you can conscientiously do so. You should listen with a disposition to be convinced to each other's arguments. If the larger number are for conviction or acquittal, dissenting juror should consider whether his doubt was a reasonable one which made no impression on the minds of so many other men, equally honest, and equally intelligent with himself. The jury should not go contrary to their convictions, but they should properly give heed to the opinions of their fellow jurors and by reasonable concessions reach a conclusion which although not originally entertained by any of them, nevertheless, may be one to which all can scrupulously adhere. In other words, the minority should listen to the views of the majority with the disposition of being convinced. Now, with that addition we will work a few minutes longer.

Kersey, 525 S.W.2d at 140. This instruction was referred to as the Allen-Simmons instruction because it was originally derived from Allen v. United States, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896), with variations approved by Simmons v. State, 281 S.W.2d 487 (Tenn. 1955).

In reviewing this instruction, this Court first observed that the trial court's inquiry as to the division of the jury was "not a proper practice." Kersey, 525 S.W.2d at 141. To remedy this improper procedure, the Kersey Court, invoking its inherent and statutory supervisory power, directed trial judges to admonish jurors not to disclose their division or personal view when returning to open court to report an inability to reach a verdict. However, the Kersey Court emphasized that trial courts may ask jurors about their progress and whether they believe further deliberations will enable them to reach a verdict. Id. Explaining that supplemental instructions may be given, "[i]f the trial judge feels that further deliberations might be productive," the Court rejected the Allen-Simmons charge, concluding that it "operate[s] to embarrass, impair and violate" the right of trial by jury guaranteed by the Tennessee Constitution. Kersey, 525 S.W.2d at 141 and 144. Discounting "any suggestion that might necessarily makes right," the Court explained:

> [a]ny undue intrusion by the trial judge into this exclusive province of the jury, is an error of the first magnitude. We recognize that the trial judge has a legitimate concern in the administration of justice and that he labors under a duty to lend guidance to the jury through instructions as to the governing principles of the law. However, when the effort to secure a verdict reaches the point that a single juror may be coerced into surrendering views conscientiously entertained, the jury's province is invaded and the requirement of unanimity is diluted.

Id.

Having rejected the Allen-Simmons charges, the Court in Kersey again exercised its statutory and inherent supervisory power and directed trial courts to comply with Section 5.4 of the American Bar Association Standards relating to trial by jury. Id. at 144. Under these standards, trial courts "may require the jury to continue their deliberations and may give or repeat an instruction or provide a supplemental instruction . . . ." Id. Trial courts "shall not require or threaten to require the jury to deliberate for an unreasonable length of time or for unreasonable intervals." Id. "The jury may be discharged without having agreed upon a verdict if it appears that there is no reasonable probability of agreement." Id. The Court concluded that if a trial court determines upon inquiry that further deliberations may result in a verdict, trial courts may give the following instruction:

> The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous. It is your duty, as jurors, to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself, but do so only after an impartial consideration of the evidence with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion

-19-

if convinced it is erroneous. But do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Kersey, 525 S.W.2d at 145. "If given as a part of the main charge, it may be repeated should a deadlock develop. Judicial economy and uniformity demand these results. Strict adherence is expected and variations will not be permissible." Id.

Nine years later, in State v. Caruthers, 676 S.W.2d 935 (Tenn. 1984), this Court considered the propriety of giving the Kersey charge in the context of a capital sentencing hearing. After deliberating on the sentence for approximately three hours, the jury in Caruthers sent the following note to the trial court:

No unanimous decision has been reached in our determining punishment for Walter Lee Caruthers. As of now the jury stands at eleven to one, with no foreseeable change. Please advise.

Caruthers, 676 S.W.2d at 942. Over the defendant's objection, the trial judge called the jury into open court and gave the Kersey charge. Just over two hours later, the jury returned with a unanimous verdict of death. The Kersey charge had been included in the jury instructions given at the conclusion of the guilt phase of the trial, but it had not been included in the instructions given at the conclusion of the sentencing phase. Id. As in this case, the defendant argued that the trial court erred in refusing to accept the jury's initial report that it was unable to agree on punishment. Caruthers, 676 S.W.2d at 942.

This Court rejected the defendant's claim that the instruction was coercive in the circumstances of Caruthers's case and, in addition, addressed, generally, the propriety of giving a Kersey instruction in a capital sentencing hearing. At that time, Tenn. Code Ann. § 39-2-203(h) provided that if a jury in a capital case "cannot ultimately agree as to punishment, the judge shall dismiss the jury and . . . shall impose a sentence of life imprisonment." Caruthers, 676 S.W.2d at 942 (quoting the statute). Explaining that "[t]he use of the adverb "u[l]timately" indicates the Legislature anticipated a jury's tentative inability to agree on punishment," this Court concluded that a trial judge should exercise discretion "in determining whether there is an ultimate disagreement as to punishment. . . ." Id. Finding that the trial court in Caruthers had not abused its discretion by refusing to accept the jury's initial report and giving the Kersey charge, this Court affirmed the sentence of death. Id.

Having summarized the governing law, we proceed to the circumstances of this case. Here, after the sentencing hearing concluded, the jury was charged and deliberations began at 4:06 p.m. on February 24, 1999. Shortly after 4:50 p.m. that same day deliberations ceased. Deliberations resumed at 9 a.m. the next morning. At 11:21 a.m. the jury sent the trial court a question about what the jury described as a "contradiction" in the instructions regarding the requirement for unanimity on aggravating circumstances when deciding on a life sentence. At 11:56 a.m. the trial court gave

a supplemental instruction on this issue, and the jury retired at noon to continue deliberations.  At 2:35 p.m. the jury sent the following message to the trial court: "We are at a deadlock, 11 for death and 1 for life imprisonment.  What do we do at this point?  The one for life imprisonment has stated that he will not change his mind."

Defense counsel immediately asked that the trial court instruct the jury to choose between sentences of life imprisonment without possibility of parole and life imprisonment.  The State, in turn, requested a Kersey charge.  Over the defendant's objections, at 2:47 p.m. the trial court called the jury into open court and gave the following instruction:

> It is your duty as jurors to consult with one another and to deliberate with a view to reaching an agreement, if you can do so without violence to your own individual judgment.  Each of you must decide the case for yourself, but you should do so only after an impartial consideration of the evidence with your fellow jurors.  In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous, but do not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.  All right.  Please continue your deliberations.

At 3:57 p.m., approximately one hour later, the jury returned to open court and announced a verdict of death.  The supplemental instruction given by the trial court omitted three prefatory sentences that are part of the charge adopted in Kersey: "The verdict must represent the considered judgment of each juror.  In order to return a verdict, it is necessary that each juror agree thereto.  Your verdict must be unanimous."  525 S.W.2d at 145.  The complete Kersey instruction had been given prior to the jury's deliberations on the defendant's guilt or innocence, but the instruction was not repeated prior to the jury's deliberations on the appropriate sentence.

The State argues that the decision in Caruthers controls the resolution of the issue in this appeal.  With respect to the general propriety of the Kersey charge at a capital sentencing hearing, we agree with the State that Caruthers controls.  The statute in effect at the time Caruthers was decided has since been repealed and replaced with Tenn. Code Ann. § 39-13-204(h) (1993), which provides:

> If the jury cannot ultimately agree on punishment, the trial judge shall inquire of the foreman of the jury whether the jury is divided over imposing a sentence of death.  If the jury is divided over imposing a sentence of death, the judge shall instruct the jury that in further deliberations, the jury shall only consider the sentences of imprisonment for life without possibility of parole and imprisonment for life.  If, after further deliberations, the jury still cannot agree as to sentence, the trial judge shall dismiss the jury and such judge shall impose a sentence of imprisonment for life.

Id. As the State correctly points out, the adverb "ultimately," which was a significant basis of our decision in Caruthers, has been retained in the amended statute. One rule of statutory construction provides that courts should presume that the General Assembly is aware and approves of prior judicial constructions when it re-enacts an earlier statute. See State v. Rhodes, 917 S.W.2d 708, 712 (Tenn. Crim. App. 1995). Thus, this Court should presume that, in enacting Tenn. Code Ann. § 39-13-204(h), the General Assembly was aware of our decision in Caruthers and approved the construction given the term "ultimately" in the context of that case.

On the other hand, the rationale for giving the Kersey charge – avoidance of the societal costs of a retrial – is not as compelling in a capital sentencing hearing because the jury's inability to agree on the sentence does not result in a retrial. See Lowenfield v. Phelps, 484 U.S. 231, 238, 108 S. Ct. 546, 551, 98 L. Ed.2d 568 (1988). The jury's inability to agree merely results in further deliberations on the punishments of life imprisonment or life imprisonment without the possibility of parole, and if the jury is unable to unanimously agree on either of these options, the trial judge imposes a life sentence. See Tenn. Code Ann. § 39-13-204(h) (1993). Nonetheless, we agree with the United States Supreme Court that "[t]he State has in a capital sentencing proceeding a strong interest in having the jury express the conscience of the community on the ultimate question of life or death." Lowenfield, 484 U.S. at 238, 108 S. Ct. at 551 (internal quotations and citations omitted). Where a jury returns from deliberations after only a short period of time and informs a trial court that it has failed to achieve unanimity, the trial court has the authority to give the Kersey instruction, but trial courts should be "mindful in such cases that the qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed." Lowenfield, 484 U. S. at 238-39, 108 S. Ct. at 551. Therefore, we reject the defendant's assertion that trial courts may never give a Kersey instruction in a capital sentencing hearing. Trial courts are afforded discretion to determine whether a jury has been "ultimately" unable to agree on punishment. However, in exercising this discretion, trial courts must be mindful that the rationale for giving the instruction is not as compelling in a capital sentencing hearing and the need for reliability is greater because of the qualitative difference between death and other penalties.

Having decided that trial courts generally are afforded discretion on this issue, we nonetheless conclude that the trial court erred by giving the Kersey instruction in this particular case. The jury had deliberated for approximately six hours on the sentencing issue before reporting: "We are at a deadlock, 11 for death and 1 for life imprisonment. What do we do at this point? The one for life imprisonment has stated that he will not change his mind." Over defense objections, the trial court returned the jury to open court and gave the instruction, despite the fact that the note expressed an unequivocal deadlock. The note did not request further instructions, and the trial court did not ask the jurors whether further instructions and deliberations might assist them in returning a verdict.[23] Instead, the trial court simply gave the instruction and ordered the jury to

_____

[23]Although Kersey does not explicitly mandate such an inquiry, the clear implication is that such an inquiry should generally always precede the giving of supplemental instructions. Kersey, 525 S.W.2d at 141 ("[T]he jury may be asked whether it believes it might reach a verdict after further deliberations. If the trial judge feels that further
(continued...)

-22-

continue deliberation. Just one hour later the jury returned with a unanimous verdict of death. While no inquiry was made, the note informed the trial court of the jury's division on the sentence of death, and the dissenting juror, who presumably had held out for six hours, likely concluded that the trial court was instructing "him," one of only four men on the jury, to reconsider his position.[24] See Lowenfield, 484 U. S. at 239-40, 108 S. Ct. at 552; Tucker v. Catoe, 221 F.3d 600, 611-12 (4th Cir. 2000) (noting factors that militate in favor of finding that the giving of a supplemental charge in a particular case is coercive).

Contrary to the State's assertion, the circumstances of this case are distinguishable from Caruthers in several important respects. The jury in Caruthers had deliberated only three hours, less than half the time the jury in this case deliberated. The note given the trial court by the Caruthers jury did not report a deadlock: the note simply reported: "[a]s of now the jury stands eleven to one, with no foreseeable change. Please advise." This language is equivocal and indicated that the vote possibly could change at a later time, as compared to the language in this jury's note "he will not change his mind". Finally, although the note in Caruthers disclosed the jury's division, it did not disclose the nature of the split or identify in any manner the dissenting juror, as in this case, thus decreasing the coercive effect of the instruction.

Considering this case "in its context and under all the circumstances,"[25] we conclude that, unlike Caruthers, the effort to secure a verdict here reached the point that a single juror may have been coerced into surrendering views conscientiously held, and under such circumstances, "the jury's province is invaded and the requirement of unanimity is diluted." Kersey, 525 S.W.2d at 144. Therefore, we conclude that the trial court erred in giving the Kersey charge rather than accepting the jury's initial report that it was deadlocked. As a result, we remand this case to the trial court for a sentencing hearing where "the jury shall only consider the sentences of imprisonment for life without possibility of parole and imprisonment for life. If, after further deliberations, the jury still cannot agree as to sentence, the trial judge shall dismiss the jury and such judge shall impose a sentence of imprisonment for life." Tenn. Code Ann. § 39-13-204(h) (1993).

## Conclusion

Having determined that the defendant is entitled to a new sentencing hearing, we need not address the other issues raised, in particular, issues relating to the appropriateness of a death sentence in this case. Accordingly, the decision of the Court of Criminal Appeals upholding the

---

[23](...continued)
deliberations might be productive, he may give supplemental instructions . . . ."). Indeed, on what basis will the trial judge evaluate whether further deliberations will be productive unless the jury responds to a direct inquiry?

[24]We note that the statute requires the trial court to determine "whether the jury is divided over imposing a sentence of death." Nevertheless, the trial court should not inquire as to the division of the jury on the issue, and as stated in Kersey, the trial court should admonish the jurors not to disclose the division of the jury on this issue.

[25]Lowenfield 484 U.S. at 237, 108 S. Ct. at 550.

defendant's conviction for first degree murder is affirmed. The sentence of death is vacated, and the case is remanded to the trial court for a new sentencing hearing in accordance with this opinion at which the jury shall only consider the sentences of imprisonment for life without possibility of parole and imprisonment for life. Costs of this appeal are taxed to the State of Tennessee, for which execution may issue if necessary.

_____
FRANK F. DROWOTA, III, CHIEF JUSTICE