# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs September 21, 2010

## STATE OF TENNESSEE v. RODNEY E. HOWARD

**Appeal from the Criminal Court for Davidson County**
**No. 2008-B-981    Cheryl Blackburn, Judge**

_____

**No.  M2009-02081-CCA-R3-CD - Filed September 29, 2010**

_____

Appellant, Rodney E. Howard, was indicted by the Davidson County Grand Jury for first degree murder.  After a jury trial, Appellant was convicted and sentenced to life in prison. After the denial of a motion for new trial, this appeal ensued.  Appellant seeks resolution of the following issues on appeal: (1) whether the evidence was sufficient to convict Appellant of first degree murder; and (2) whether the trial court erred by refusing to admit the transcript of the preliminary hearing testimony of a defense witness.  After a review of the record, we determine that the evidence was sufficient to convict Appellant of first degree murder. Additionally, we determine Appellant waived the issue regarding the admission of the transcript for failure to move for the introduction of the transcript under the rule of completeness. Moreover, any error with respect tot he transcript was harmless. Accordingly, the judgment of the trial court is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

Jeffrey A. DeVasher, Assistant Public Defender, on appeal, and J. Michael Engle, Assistant Public Defender, at trial, for appellant, Rodney E. Howard.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; Victor S. Johnson, District Attorney General; and Jeff Burks, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## *Factual Background*

On April 18, 2008, Appellant was indicted for first degree murder for the shooting death of Delltramaine Faust on February 1, 2008. At trial, the following evidence was presented to the jury.

On February 1, 2008, around noon, Vincent Overton met Delltramaine Faust, the victim, at a bus stop in downtown Nashville, Tennessee. Mr. Overton had seen Mr. Faust before, but the two men did not really know each other until February 1. Mr. Overton knew the victim as "Atlanta." Mr. Faust told Mr. Overton that he had just been released from jail. Both men rode a bus to the Riverchase Apartments, near Meridian Street. When they arrived, Mr. Overton went to a friend's apartment to get high. Mr. Overton saw Mr. Faust run toward a blue car that was leaving the apartment complex. Mr. Overton testified that he ended up just visiting with his friend and did not get high.

When Mr. Overton left his friend's apartment, he saw Mr. Faust run to the porch of 709 Joseph Avenue and knock on the door. Then, Mr. Overton saw Appellant and a woman come out of the front door of 717 Joseph Avenue, two doors down from where Mr. Faust was located. The woman was carrying several bags and walked to a car parked across the street. Appellant was carrying a gun described as a black revolver with a long barrel. Mr. Overton commented to Appellant that he was going to get arrested if he continued to walk "around with a gun out like that."

At that time, Mr. Overton saw Mr. Faust jump off the porch on which he was standing and run to the other side of the building. According to Mr. Overton, Appellant "kind of took off running after him." Appellant stopped, and Mr. Faust came back toward Appellant to say something to him. Mr. Overton could not hear what the men were saying but stated that he thought Mr. Faust was trying to apologize for something because of the way he was gesturing. Mr. Overton stated that Mr. Faust was not armed.

Mr. Overton saw Appellant point the gun at Mr. Faust. Mr. Overton told Appellant to "think about what you're fixing [sic] to do man." Appellant looked at Mr. Overton for a brief moment before turning back to Mr. Faust, who started to run away. Appellant then fired three or four shots at the victim. Mr. Overton testified that the "vapor trails" led him to believe that all of the shots hit the victim in the torso. Appellant was standing approximately twelve feet away from Mr. Faust when the shots were fired.

A woman emerged from 709 Joseph Avenue and asked Appellant "why did he do that on the side of her house" before going back inside. Mr. Overton saw Appellant go back inside 717 Joseph Avenue after the shooting. Appellant then came outside with a female who was carrying bags. They got into a car and left the scene.

Mr. Overton walked over to Mr. Faust who was lying on the ground. There was blood coming out of his face. Mr. Overton did not see a weapon. Mr. Overton went to a store one block away and tried to use the telephone, but the clerk would not let him. Soon, Mr. Overton heard sirens approaching.

As he walked back to the scene, Mr. Overton saw a police officer. He told the officer to meet him around the corner of a building. Mr. Overton did not want anyone to see him talking to the police. The police handcuffed him and placed him in a patrol car, but they did not place him in custody. The officers took Mr. Overton to the police station where he recounted the events and identified Appellant in a photographic lineup. Mr. Overton admitted that he had prior convictions for burglary and aggravated burglary.

The woman who lived at 709 Joseph Avenue was identified as Tawana McGill. She testified at trial that she was upstairs trying to sleep sometime around noon on February 1, 2008, when she heard voices that she did not recognize outside her apartment. She did not hear anyone knock on her door. Soon thereafter, she heard three or four gunshots. When she looked out the window, she saw Appellant and another man standing on the sidewalk. Ms. McGill testified that the other man was neither the victim nor Mr. Overton. After hearing the gunshots, Ms. McGill went outside and saw the victim, whom she knew as "Del," lying on the ground at the side of her residence. She called 911 and reported what she saw to authorities. Ms. McGill later identified Appellant from a photographic lineup.

At trial, Ms. McGill reviewed her interview. She claimed that the report incorrectly reflects that she told the detective that she saw Appellant with a gun. Further, she claimed that the report incorrectly stated that she saw Appellant fire a gun and saw Appellant go back into 717 Joseph after the shooting.

Mr. Faust died as a result of two gunshot wounds to his body. The wounds were located on the left side of the back of the head and the left thigh. According to the medical examiner, either wound would have been fatal. Additionally, the placement of the wounds indicated that the victim had his back turned to the shooter.

Appellant was taken into custody within an hour of the shooting. Police later executed a search warrant of 717 Joseph Avenue. During the search, the police recovered a .38 caliber revolver that matched the description of the gun used in the shooting. They also located

spent .38 cartridge casings. The revolver was dusted for fingerprints and six latent prints were found matching Appellant's fingerprints. One fingerprint did not match either Appellant or the victim. The bullets recovered from the body of the victim and the cartridge casings recovered from 717 Joseph were fired from the revolver that was also recovered during the execution of the search warrant.

During the investigation of the case, Latasha Morrow was discovered as the owner of a brown Chevrolet Malibu that was parked out in front of 717 Joseph Avenue on the day of the shooting. Ms. Morrow was called by the defense to testify to raise the defense that Mr. Faust was the first aggressor because he had allegedly robbed Appellant, Ms. Morrow, and Appellant's family prior to February 1, 2008.

Ms. Morrow testified that she and Appellant were in a relationship at the time of the incident in question. They met in November of 2007. Ms. Morrow lived in Bowling Green, Kentucky, at the time but came to Nashville to spend time with Appellant at his mother's home on Joseph Avenue. At the time of trial, the two were no longer in a relationship.

On the morning of February 1, 2008, Ms. Morrow woke up around eleven so that she could go pick up her children in Bowling Green by 5:00 p.m. Around noon, she took her purse and one of her two bags and hit the remote starter on her Chevrolet Malibu that was parked outside the residence. Ms. Morrow walked out to the car while Appellant stayed behind to put on his shoes. Appellant was going to carry Ms. Morrow's other bag to the car.

When she exited the residence, Ms. Morrow claimed that a guy "came from nowhere" and tried to grab her purse. The man had his shirt pulled up so that his mouth was covered. Ms. Morrow's purse was around her neck, so the two began struggling over the purse. Ms. Morrow tried to pull the purse back toward her and Appellant walked out of the house. The man backed away and jogged back toward the direction he came from. Ms. Morrow testified that she saw a gun in the victim's hand.

According to Ms. Morrow, Appellant stood in the front yard with a gun in his hand. Ms. Morrow lost sight of the victim, then heard two gunshots. Appellant fired two shots in response. Ms. Morrow could not see the man, so she did not know that he was shot.

At that point, Ms. Morrow testified that Appellant ran into the house. Ms. Morrow started to leave when Appellant came out and asked for a ride to the store to buy cigarettes. The store was "like two seconds" from the house. Ms. Morrow drove Appellant to the store where he bought cigarettes, then drove him back home. They did not discuss the incident. Ms. Morrow left to drive to Bowling Green. She did not know the man had been shot until she was contacted by Appellant's mother.

Ms. Morrow testified that she recognized the man from two weeks before as the man who had tried to rob Appellant's mother. Mrs. Morrow testified that two weeks prior to this incident, she was visiting at Appellant's apartment with his mother, stepfather, brother, and her cousin, when someone knocked on the door. Two men with guns were on the front porch and demanded money. Ms. Morrow sneaked upstairs, so the men did not notice her. According to Ms. Morrow, Mr. Faust was the perpetrator of both the incident with Appellant's mother and the attempt to snatch her purse.

Ms. Morrow recalled testifying at the preliminary hearing. She denied her previous testimony that Mr. Faust fired several shots at her and Appellant when he tried to grab the purse but was confronted with the testimony from the hearing wherein she testified that Mr. Faust "started backing up, and then he started firing shots."

Ms. Morrow denied telling the prosecutor and a detective that Mr. Faust did not have a gun. She explained that she heard the shots fired but did not see Mr. Faust fire shots because he was around the side of the apartment building.

Rodrick Donaldson also testified in Appellant's behalf. Mr. Donaldson is engaged to Appellant's mother, Vickie Howard, and has lived at 717 Joseph since 2007. Mr. Donaldson testified regarding a robbery that occurred at the home in January of 2008. During the robbery, two men knocked on the door of 717 Joseph Avenue and entered the residence armed with guns. One of the men held his shirt over his face and the other man wore a bandana. One of the men stayed by the front door and demanded money. The men pointed their guns at the people in the residence. Mr. Donaldson testified that everyone denied having money until one of the men cocked his gun and told them he was going to kill Mr. Donaldson if he did not hand over the money. Mr. Donaldson gave the men $800 that Ms. Howard had just received from an early tax refund. Mr. Donaldson identified one of the robbers as "Del" because he heard Appellant's cousin George, who was also at the residence, refer to the robber as "Del." Mr. Donaldson did not report the robbery to police and refused to speak to police about the incident on the day of the trial.

The State called Detective Michael Windsor to testify in rebuttal. Detective Windsor interviewed Ms. Morrow prior to trial and asked her if she saw Mr. Faust with a gun. She stated that she did not see him with a gun. Further, after a search, Detective Windsor was unable to find any robbery complaints on file for 717 Joseph Avenue from November 2007 through January 31, 2008.

Agent James Russell Davis was also called as a rebuttal witness. Agent Davis is special agent in forensic science with the Tennessee Bureau of Investigation. Specifically, Agent Davis is an expert in gunshot primer residue analysis. According to Agent Davis, Mr.

Faust did not have any of the component chemicals on his hands that would indicate he had recently fired a gun but the results of the test "can neither eliminate the possibility that the individual could have fired, handled, or was near a gun when fired."

At the conclusion of the proof, the jury found Appellant guilty of first degree murder. Appellant was sentenced to life in prison as a result of the conviction. Appellant subsequently filed a motion for new trial in which he alleged: (1) that the trial court erred by refusing to admit the preliminary hearing transcript of Ms. Morrow's testimony into evidence "after extensive references to it during her cross examination;" (2) that the trial court erred in "overruling [Appellant's] objection to the prosecution's attempts to impeach [Ms. Morrow] by reference to documents that she professed to never having seen, but which the prosecution claimed to be of record from the 'Bond Source Hearing;'" (3) that the trial court erred by allowing the medical examiner to testify as to the position and movement of the victim when the gunshots were fired; (4) that the trial court erred by failing to instruct the jury on the "rule of cancellation;" and (5) the evidence was insufficient to support the conviction.

The trial court denied the motion for new trial after a hearing. Appellant filed a timely notice of appeal. On appeal, Appellant argues that the evidence was insufficient and that the trial court erred by refusing to admit the transcript of the preliminary hearing testimony of Ms. Morrow.

*Analysis*

*Admission of Preliminary Hearing Transcript*

On appeal, Appellant argues that the trial court erred by failing to admit the transcript of Ms. Morrow's testimony at the preliminary hearing into evidence. The issue arose during trial when defense counsel informed the trial court that the purpose of allowing Ms. Morrow and Mr. Donaldson to testify would be to raise the issues of self-defense and defense of another by showing that Mr. Faust was the first aggressor. Defense counsel explained that both witnesses would testify that Mr. Faust took part in a robbery at Appellant's residence approximately two weeks prior to the shooting. The trial court ruled that the defense witnesses would have to testify in a manner that supported the defenses. Defense counsel then tendered Ms. Morrow's preliminary hearing testimony as evidence. The trial court denied the request, ruling the transcript inadmissible at that point. The trial court required the defense to make an offer of proof of Ms. Morrow's intended testimony prior to determining whether it established that the victim was the first aggressor.

After hearing the proffered testimony, the trial court determined that it adequately raised the issue of self-defense. Ms. Morrow was permitted to testify about the alleged home invasion in front of the jury. The trial court also determined that it would issue a limiting instruction to the jury directing them to consider the home invasion incident for corroborating a theory that the victim was the first aggressor.

Ms. Morrow testified in front of the jury that just prior to the shooting, Mr. Faust "came out of nowhere" and tried to grab her purse. A struggle ensued because it was around her neck. Then, Appellant came out the door and interrupted the robbery. Mr. Faust "started like backing up, lightly running towards the direction he came from, back to his left." Ms. Morrow testified that Mr. Faust had a gun. Specifically, she stated "once he got to the corner, he had one in his hand." Appellant also had a gun in his hand at that time. Mr. Faust was around the corner and she "heard a couple of gunshots" fired by Mr. Faust. Ms. Morrow testified that Mr. Faust fired first at Appellant, and Appellant returned fire. She also testified that approximately two weeks prior to the incident, Mr. Faust robbed Appellant and his family at their residence. Ms. Morrow claimed that she did not know what happened to Mr. Faust.

On cross-examination, counsel for the State asked Ms. Morrow several questions about her preliminary hearing testimony. The transcript of the preliminary hearing was admitted for identification purposes only on motion of defense counsel. During deliberations, the jury sent a note to the trial court asking to be provided with the preliminary hearing transcript of Ms. Morrow's testimony. The trial court instructed the jury that:

> The testimony of Ms. Morrow at the preliminary hearing was not admitted as an exhibit. Any statements of this witness made at the preliminary hearing or out of court outside the jury's presence may only be considered by the jury on the issue of Ms. Morrow's credibility as a witness and the testimony she provided under oath in the jury's presence. You may not consider out of court statements for the truth of the statements made outside of court.

On appeal, Appellant argues that the cross-examination was so extensive that the admission of the preliminary hearing transcript was required by Rule 106 of the Tennessee Rules of Evidence, also known as the rule of completeness. Although the transcript was admitted for identification purposes, Appellant failed to seek introduction of the preliminary hearing transcript during trial under the rule of completeness, even after redirect examination. Thus, the issue is waived. *See* Tenn. R. App. P. 36(a) (stating that appellate relief is generally not available to a party that has "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of any error"); *see also State v. Lloyd E. Farrell*, No. 02C01-9708-CC-00327, 1998 WL 808539, at *8 (Tenn. Crim. App., at Jackson,

Nov. 23, 1998), *perm. app. denied*, (Tenn. May 10, 1999) (determining that defendant waived the issue of Rule 106 by failing to seek admission of tape recordings during trial).[1]

Despite the waiver, we agree with the State that Ms. Morrow was not questioned "so extensively on her preliminary hearing testimony that the State effectively introduced the prior testimony." During cross-examination at trial, counsel for the State asked Ms. Morrow four specific questions that required either reading or quotation from the preliminary hearing transcript. Specifically, counsel for the State asked:

Q:    In your preliminary hearing testimony you testified that when - - when the person who tried to grab your purse, when he wasn't able to grab your purse, he then backed up and fired several shots at you and [Appellant], correct?

A:    No, sir. I never said anything about him firing shots at me.

Q:    Okay. Well, but you testified that he started backing up and firing shots at you, did you not?

A:    No, sir.

Q:    Okay. I would refer to page seven [of the preliminary hearing transcript] - - can I just show this?

. . . .

Q:    You were asked, [reading from the transcript] what did you do when he tried to grab your purse. [Reading from the transcript:]
            I started walking towards the car.
            You started walking towards the car. Did he get
            the purse?
            No.
            When Mr. Howard came out, what did Mr. Faust
            do then?

---

[1]We note that in July of 2009, after the trial in this case, Tennessee Rule of Evidence 803 was amended to permit the introduction of some prior inconsistent statements, including statements given under oath. Additionally, the rule allows for these statements to be treated as substantive evidence. *See* Tenn. R. Evid. 803(26) (2009).

> He had started backing up, and then he started firing shots. Was that your testimony?
>
> A: Yes, sir.
>
> Q: Well, that's at variance, wouldn't you agree, with the idea that he ran around the other side of this building and maybe fired some shots back there?
>
> A: That's what I'm saying. When he had backed up towards the corner of the house, that's when he had started firing shots. That's what I said.
>
> Q: Okay. That's not what you said. You said he ran around to the other side of the house where you couldn't see him anymore, but I could see Mr. Howard and he wasn't firing shots.

Counsel for the State next asked Ms. Morrow about her testimony at the preliminary hearing with regard to when she first saw Mr. Faust with a gun, as follows:

> Q: You also testified in the Court below that this person that tried to grab your purse did not pull out a weapon until he had seen [Appellant] come out of the house; is that correct?
>
> A: That's correct.
>
> Q: And that is still your testimony?
>
> A: That is correct.

Next, during cross-examination, after Ms. Morrow testified that Mr. Faust had a gun when he first approached her on the porch, she then testified that he *did not* have a gun when he first approached her on the porch. At that point, counsel for the State asked Ms. Morrow about her testimony on page thirteen of the preliminary hearing transcript wherein she stated that she "struggled with [Mr. Faust], but [Mr. Faust] didn't have a weapon at that point. No, he didn't pull the weapon out until after he had seen [Appellant] coming out - - walking out of the house." Ms. Morrow did not exactly explain the discrepancy in her testimony. Instead, she replied:

A:      The what now? When [Appellant] had came [sic] out the house, I was
        still standing on the sidewalk. The guy started backing up. And when
        he had got [sic] around to where I couldn't even see him no more [sic],
        that's when I heard gunshots.

Counsel for the State asked Ms. Morrow one final question about her preliminary hearing testimony. Counsel asked Ms. Morrow if she testified in the preliminary hearing that Mr. Faust fired two shots prior to running around the corner of the building. The preliminary hearing transcript indicates that Ms. Morrow testified that Mr. Faust fired "about two" shots and then ran off "around the side of the apartment where he had came [sic] from." At trial, Ms. Morrow responded that she "never testified [in the preliminary hearing that] any gunshots were fired before her purse was grabbed."

Rule 106 of the Tennessee Rules of Evidence Provides:

When a writing or recorded statement or part thereof is introduced by a party,
an adverse party may require the introduction at that time of any other part or
any other writing or recorded statement which ought in fairness to be
considered contemporaneously with it.

Tenn. R. Evid. 106. This rule reflects the concern for fairness that the trier of fact be permitted to access related information in a statement without being mislead by hearing only selected portions of the statement. *State v. Keough*, 18 S.W.3d 175, 182 (Tenn. 2000). Rule 106 has been subjected by our courts to the following considerations and limitations:

Rule 106 is circumscribed, however, by two qualifications: (1) evidence
proffered pursuant to this rule must be relevant to issues in the case; and (2)
the evidence must explain or qualify already-admitted proof. Some courts
have addressed the second qualification by asking whether the proffered
evidence accomplishes one of the following objectives: (1) explains the
admitted proof; (2) places the admitted proof in context; (3) avoids misleading
the trier of fact; or (4) ensures a fair and impartial understanding of the
admitted proof.

*State v. William Pierre Torres*, No. E1999-00866-CCA-R3-DD, 2001 WL 245137, at *33 (Tenn. Crim. App. at Knoxville, Mar. 13, 2001) (internal citations omitted), *aff'd in part and rev'd in part by State v. Torres*, 82 S.W.3d 236 (Tenn. 2002). A trial court's decision to admit a written document under Rule 106 will only be reversed upon a showing that the trial court abused its discretion. *See State v. Christopher Shane Harrell*, No.

E2005-01531-CCA-R3-CD, 2007 WL 595885, at *9 (Tenn. Crim. App. at Knoxville, Feb. 26, 2007), *perm. app. denied* (Tenn. June 25, 2007).

Despite waiver of the issue for failure to move for the introduction of the transcript under Rule 106, we determine that the State did not question Ms. Morrow to an excessive degree about her preliminary hearing testimony such as to require the admission of the document into evidence. Ms. Morrow explained the rather minor inconsistencies in her trial and preliminary hearing testimony and admission of the entire preliminary hearing transcript was not necessary to: (1) explain the admitted proof; (2) place the admitted proof in context; (3) avoid misleading the trier of fact; or (4) ensure a fair and impartial understanding of the admitted proof. *William Pierre Torres*, 2001 WL 245137, at *33. Thus, any error as a result of the exclusion of the transcript would be harmless error. Appellant is not entitled to relief on this issue.

*Sufficiency of the Evidence*

Appellant argues that the evidence is insufficient to support the conviction for first degree murder. Specifically, he argues that the proof "shows a spontaneous and unplanned shooting . . . of a man who was approaching him in a possibly threatening manner" and that the victim was shot after trying to rob Appellant's girlfriend and firing shots. The State disagrees.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" State's witnesses and resolves all conflicts in the testimony in favor of the State. *State v. Cazes*, 875 S.W.2d 253, 259 (Tenn. 1994); *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. *Id.* The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Harris*, 839 S .W.2d at 75. In making this decision, we are to accord the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." *See Tuggle*, 639 S.W.2d at 914. As such, this Court is precluded from reweighing or reevaluating the evidence when considering the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*,

805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).

First degree murder is described as "[a] premeditated and intentional killing of another; . . . ." T.C.A. § 39-13-202(a). Tennessee Code Annotated section 39-13-202(d) provides that:

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

An intentional act requires that the person have the desire to engage in the conduct or cause the result. T.C.A. § 39-11-106(a)(18). Whether the evidence was sufficient depends entirely on whether the State was able to establish beyond a reasonable doubt the element of premeditation. *See State v. Sims*, 45 S.W.3d 1, 7 (Tenn. 2001); *State v. Hall*, 8 S.W.3d 593, 599 (Tenn. 1999). Whether premeditation is present is a question of fact for the jury, and it may be inferred from the circumstances surrounding the killing. *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006); *see also State v. Suttles*, 30 S.W.3d 252, 261 (Tenn. 2000); *State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998).

Premeditation may be proved by circumstantial evidence. *See, e.g., State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992). Our supreme court has identified a number of circumstances from which the jury may infer premeditation: (1) the use of a deadly weapon upon an unarmed victim; (2) the particular cruelty of the killing; (3) the defendant's threats or declarations of intent to kill; (4) the defendant's procurement of a weapon; (5) any preparations to conceal the crime undertaken before the crime is committed; (6) destruction or secretion of evidence of the killing; and (7) a defendant's calmness immediately after the killing. *See State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997); *Pike*, 978 S.W.2d at 914-15. This list, however, is not exhaustive and serves only to demonstrate that premeditation may be established by any evidence from which the jury may infer that the killing was done "after the exercise of reflection and judgment." T.C.A. § 39-13-202(d); *see Pike*, 978 S.W.2d at 914-15; *Bland*, 958 S.W.2d at 660.

One learned treatise states that premeditation may be inferred from events that occur before and at the time of the killing:

> Three categories of evidence are important for [the] purpose [of inferring premeditation]: (1) facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing, that is, planning activity; (2) facts about the defendant's prior relationship and conduct with the victim from which motive may be inferred; and (3) facts about the nature of the killing from which it may be inferred that the manner of killing was so particular and exacting that the defendant must have intentionally killed according to a preconceived design.

2 Wayne R. LaFave, *Substantive Criminal Law* § 14.7(a) (2d ed. 2003).

In the case at hand, the jury concluded that Appellant acted with premeditation when killing the victim. Several of the circumstances listed by our supreme court from which a trier of fact can infer premeditation were present in the facts presented to the jury. Appellant used a deadly weapon, the gun, to kill the seemingly unarmed victim. The testimony of the medical examiner indicated that the victim was shot as he was walking away from Appellant. In addition, immediately after the murder, Appellant got in a car with Ms. Morrow and rode to the store to get cigarettes, making no mention of the fact that he had just shot and killed Mr. Faust. The gun used to commit the crime was found in a laundry hamper with shoes in a closet in Appellant's residence, presumably placed there by Appellant on the assumption that the police would be looking for the weapon. This clearly shows calmness immediately after shooting the victim.

As stated above, the trier of fact determines the credibility of the witnesses, any issues of fact, and the weight to be given the evidence presented at trial. *Pruett*, 788 S.W.2d at 561. The jury clearly found that Appellant acted both intentionally and with premeditation when he shot the victim twice. We conclude that when the evidence is viewed in a manner that favors the State, there is sufficient evidence to support the jury's verdict with regard to the first degree murder conviction.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.


_____
JERRY L. SMITH, JUDGE