# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 6, 2009

## PHILLIP LOWELL BLEDSOE v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Gibson County**
**No. 16263     Clayburn L. Peeples, Judge**

---

**No. W2009-00684-CCA-R3-PC   -   Filed November 9, 2010**

---

The Petitioner, Phillip Lowell Bledsoe, appeals from the Gibson County Circuit Court's denial of post-conviction relief from his conviction for first degree premeditated murder. In his appeal, the Petitioner argues that he received ineffective assistance of counsel because trial counsel failed to pursue potentially exculpatory evidence; failed to impeach a detective's credibility based on his police misconduct in a different case; failed to object to numerous references to the Petitioner's gang membership; and failed to file a motion in limine, make an objection, or request a limiting instruction regarding references to a polygraph examination. Upon review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which ALAN E. GLENN and D. KELLY THOMAS, JR., JJ., joined.

Barbara Hobock and Cynthia Chandler-Snell, Humboldt, Tennessee, for the Petitioner-Appellant, Phillip Lowell Bledsoe.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Garry G. Brown, District Attorney General; and Edward L. Hardister, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

**Factual Background.** The facts in this case were summarized by this court on direct appeal:

> In the early morning hours of February 10, 2002, Milan Police Sergeant Andrea Davis was on patrol when she observed the appellant and the victim arguing in the parking lot of the American Legion Post ("The Post"), a local

nightclub. Sergeant Davis drove into the parking lot and asked if there was a problem. They responded that there was no problem and walked off. Sergeant Davis observed no weapons and overheard no threats. Nevertheless, she parked across the street at the Rock and Shirl nightclub "to keep an eye on the situation." Thereafter, the victim and Tyrone Edwards walked down the street, and the appellant and his girlfriend, Tammy Peete, got into Tammy's vehicle and drove in the opposite direction.

Approximately fifteen minutes later, Sergeant Davis responded to a call of a shooting at the intersection of Robinson Street and Ellis. When she arrived, Edwards was performing CPR on the victim, whose body was laying on the street. A crowd began to gather around the victim's body. At trial, Sergeant Davis testified that she observed Tammy's vehicle, a white Chrysler, parked on Robinson Street near the scene. She also observed Tammy and her brother, Jeremiah Peete, at the scene. Jeremiah approached Sergeant Davis to ask what happened. Sergeant Davis testified that she did not see the appellant at the scene. She related that Edwards was arrested at the scene for disorderly conduct. She further related that Greg Cook drove a green Pontiac Grand Prix.

Early that same morning, Dallas Emerson was driving his girlfriend home when he observed a body in the middle of the street at the intersection of Robinson Street and Ellis. Emerson observed Edwards attempting to help the injured individual. As Emerson approached the intersection, Edwards ran over to his vehicle and told him to call the police because "his partner had been shot." Emerson drove to a nearby store. As Emerson drove to the store, he observed a green Grand Prix "backing . . . down" Robinson Street. Emerson testified at trial that he had previously observed Greg Cook driving a green Grand Prix. At trial, Emerson related that he did not see the appellant that morning.

Jerry Hartsfield testified that in February 2002 he was employed by the Milan Police Department and investigated the victim's murder. Hartsfield related that shortly after the shooting he interviewed Edwards, who stated that "[the appellant] shot at [the victim] and missed and then shot again." After interviewing Edwards, Hartsfield went to Tammy's house to talk with the appellant. Hartsfield stated that he "did everything but beat the door down," but no one came to the door. Hartsfield testified that a nine-millimeter bullet casing was discovered at the scene and collected as evidence.

Hartsfield testified that he did not interview the appellant until the following day when the appellant surrendered at the Gibson County Jail. In his statement to Hartsfield, the appellant claimed that he had argued with the victim at The Post because the victim refused to pay the charge for reentering the nightclub. He told Hartsfield that approximately twenty minutes later as he was leaving the nightclub, the victim asked him if he "had a problem with him running in and out [of the nightclub]." The appellant informed the victim that upon reentering the nightclub he was required to pay a one dollar reentry fee. Shortly thereafter, the appellant observed the victim and Edwards walking away from the nightclub. According to the appellant, the victim and Edwards were arguing, and Edwards had a gun in the front of his pants. In his statement, the appellant denied seeing the victim and Edwards again that morning. The appellant claimed that he went home to sleep. The next morning, the appellant learned that he was suspected of shooting the victim. He immediately left Milan and went to a hotel in Jackson, where he stayed until he observed a news report about the victim's murder. The appellant then decided to surrender to the authorities. In his statement, the appellant denied being in Cook's vehicle at the time of the shooting.

On cross-examination, Hartsfield acknowledged that he did not observe the appellant at the crime scene. He further acknowledged that he did not test the appellant's hands for gunpowder residue. However, he claimed that because he did not interview the appellant until the day after the shooting, any gunpowder residue would have likely been washed away.

Tyrone Edwards testified that on February 10, 2002, he and the victim went to The Post where the appellant was working the door. He and the victim argued with the appellant after the appellant told the victim that he had been barred from the nightclub. Despite being barred, the victim and Edwards entered the nightclub. Later, as they were leaving, they encountered the appellant in the parking lot. According to Edwards, they "almost got to fighting," but the police arrived. Thereafter, the appellant left with his girlfriend in her vehicle, and Edwards and the victim walked to the victim's house. After the victim stopped at his house, he and Edwards walked to the intersection at the end of the street.

As they approached the intersection, Edwards observed the white vehicle belonging to the appellant's girlfriend. Edwards told the victim that they should go home. Edwards began to walk towards his house, but the victim remained near the intersection. Edwards observed a green Grand Prix

pull up behind the victim. The appellant and Greg Cook jumped out of the vehicle and began arguing with the victim. Edwards observed the appellant "pull out [a] pistol" and shoot once over the victim's head. The victim then attempted to take the pistol from the appellant. However, when the victim rushed the appellant, the pistol discharged, and the victim grabbed his side and fell to the ground. As the victim fell, Edwards observed Cook running towards him. Cook pulled a gun from his pants and shot at Edwards. The appellant and Cook then "took off." The appellant ran behind the victim's house, and Cook got into his vehicle and drove away. Edwards stopped a man driving a white Chevrolet and asked him to call the police. Edwards testified that neither he nor the victim had a weapon that morning.

Edwards testified that as a juvenile he had been a member of the Gangster Disciples. He further testified that at the time of the shooting, the victim, the appellant, and Cook were members of the Gangster Disciples. According to Edwards, the victim "was at odds with th[e] gang" because he no longer wanted to be a member. Edwards related that "it [was] . . . an accepted principle that you don't get out of a gang." Edwards testified that he had received threats for testifying against the appellant.

James Greg Cook testified that at approximately 2:45 a.m. on February 10, 2002, the appellant came to his house and asked him for a ride home. During the drive, the appellant told Cook to drive to Robinson Street. Cook related that the victim lived on Robinson Street. Cook observed Edwards and the victim walking along Robinson Street. The appellant asked Cook to let him out of the vehicle, and Cook complied. Cook testified that "as [the appellant] was getting out I heard a shot. Well, what I thought was a shot, and then I seen him run across the grass, run up to [the victim]." Cook then observed Edwards running away. Cook heard another shot and observed the victim grab his side and fall to the ground. The appellant ran away.

After the shooting, Cook went into hiding in Missouri. He was subsequently arrested in Humboldt, Tennessee, after being stopped for traffic violations. At trial, Cook conceded that his testimony was different from the statement he gave to Hartsfield, in which statement he claimed that he was not with the appellant that morning and was not involved in the shooting. He further conceded that neither Edwards nor the victim had a weapon. Cook testified that he and the victim had been members of a gang in Milan; however, he was unable to recall whether the appellant had been a gang member. According to Cook, members could "get out" of the gang, though "some . . .

members frown on it." Cook acknowledged that on the night of the shooting he was driving his girlfriend's green Grand Prix. Cook testified that the appellant shot the victim, but he denied shooting at Edwards.

Terry Lee testified that he had known the appellant for approximately five years and had been confined with the appellant at the Gibson County Jail following the shooting. According to Lee, while in confinement, the appellant discussed the details of the shooting. The appellant told Lee that he and the victim had argued at The Post because the victim attempted to enter the nightclub without paying. When the victim left, the appellant followed him to the parking lot, and they argued. After leaving the nightclub, the appellant went to Greg Cook's house, and Cook drove him to the intersection at Robinson Street and Ellis. Cook stopped the vehicle near the victim and Edwards, who were standing at the intersection. The appellant jumped out of the vehicle and started shooting. The appellant told Lee that he and Cook attempted to stop Edwards as he fled, but they were unsuccessful. The appellant and Cook then fled the scene.

Lee testified that the appellant and the victim were members of the Gangster Disciples. The appellant told Lee that the victim wanted out of the gang. Lee claimed that the appellant subsequently learned that he had spoken to investigators about the shooting. In a letter dated May 9, 2003, Lee asked the district attorney to transfer or release him from the Gibson County Jail because the appellant was a leader in a gang and the jail was "full of gang members." Lee said that he feared for his life. Lee was transferred to the Madison County Jail.

Dr. Cynthia Gardner testified that in February 2002 she was an assistant medical examiner for Shelby County and performed the victim's autopsy. Dr. Gardner testified that the cause of the victim's death was a gunshot wound to the chest. According to Dr. Gardner, the victim was more than two feet away from the pistol when shot. Dr. Gardner related that the bullet traveled straight through the victim's body. She further related that no drugs were detected in the victim's system, but the victim had a blood alcohol content of .095 percent.

Tammy Peete testified on behalf of the appellant at trial. She related that on February 10, 2002, she was at home with her three children. At approximately 2:15 a.m., the appellant telephoned and asked her to pick him up at The Post. When she arrived, the appellant was outside with Edwards and the victim. They appeared to be talking, but Tammy soon realized they were

arguing. Tammy sent someone into the nightclub to tell her brothers to come outside. Thereafter, her brothers came outside and told the appellant "wasn't nobody fixing to fight." At that time, a police officer drove up and told them to leave. Edwards and the victim walked away. The appellant got into Tammy's white Chrysler New Yorker, and they left.

Tammy and the appellant drove to a nearby Huddle House, but the restaurant was too crowded. They then returned to the nightclub to check on her brothers. When they did not see them, they drove home. Tammy testified that when they arrived home, the appellant went inside and went to sleep. Shortly thereafter, her brothers arrived at her house to ask the appellant to go to Huddle House. However, they were unable to wake the appellant and they left. According to Tammy, the appellant did not wake until 8:30 a.m.

Later that morning, Tammy's sister Sabrina came to the house and informed Tammy that the victim had been shot. She subsequently told Tammy that the appellant was being accused of the crime. Upon learning that he was a suspect in the shooting, the appellant left without telling Tammy where he was going. Tammy testified that the night of the shooting, Chief Nolan came to her house looking for the appellant. Tammy told him that she did not know where the appellant was, but he had been at home at the time of the shooting. Tammy testified that she did not speak to the appellant until he turned himself in the next day. On cross-examination, Tammy denied being at the scene of the shooting. She further denied that on the night of the shooting Hartsfield came to her house and banged on the door.

Tammy's brothers, James and Jeremiah Peete, also testified on behalf of the appellant. James testified that on the night of the shooting he left The Post at approximately 3:00 a.m. The appellant had left the nightclub earlier with Tammy. James recalled that before the appellant left, there was a "little commotion" in the parking lot. James went outside and observed Edwards hitting the rear of Tammy's vehicle, saying, "Let 'em fight. Let 'em fight." However, he did not observe anyone fighting. Thereafter, the appellant got into Tammy's vehicle, and he and Tammy drove away. James returned to the nightclub.

James testified that he subsequently left the nightclub with his brother and two female friends. They decided to go to Tammy's house, but as they turned onto Robinson Street, they observed Sergeant Davis's patrol vehicle with its lights activated. Sergeant Davis stopped the vehicle and said, "Ya'll

can't come over here." According to James, his brother walked to the scene and observed the victim's body laying in the street. Thereafter, they drove to Tammy's house. When they arrived at Tammy's house, the appellant was asleep in bed. James and Jeremiah were unable to wake the appellant and they left. On cross-examination, James acknowledged that when he arrived at his sister's house, he did not tell her about the murder. He also conceded that he did not know if the appellant shot the victim.

Jeremiah testified that he left the nightclub about the time it closed. As he left, he observed Sergeant Davis driving through the parking lot. Jeremiah denied seeing anyone fighting or arguing. He also testified that he did not hear Edwards saying, "Let 'em fight." Jeremiah observed the appellant get into Tammy's vehicle and leave. The victim walked away with Edwards. Jeremiah testified that he and James subsequently left the nightclub with two female friends and went to Huddle House. Thereafter, they went to Tammy's house. However, because the appellant was in bed asleep, they left. Upon leaving Tammy's house, they observed "a lot of police and stuff in the road." Sergeant Davis approached the vehicle and told them to "[g]o back." Jeremiah asked Sergeant Davis what had happened, and she informed him that the victim had been shot.

At trial, the appellant testified that on February 10, 2002, he worked the door at The Post. He related that the victim and Edwards became angry when he told them they had to pay a one dollar fee to reenter the nightclub. At approximately 2:00 a.m., the appellant telephoned Tammy to pick him up, and he went to the parking lot to wait. According to the appellant, "that's when it all started." Edwards was "mouthing," and the victim was standing nearby. About that time, Tammy arrived, and the appellant got into her vehicle. When Sergeant Davis arrived shortly thereafter, Edwards and the victim walked away. Sergeant Davis asked if there was a problem, and the appellant told her no. The appellant and Tammy left and drove to Huddle House; however, Huddle House was crowded. They returned to the nightclub to check on Tammy's brothers and then went home.

The appellant testified that upon arriving home, he immediately went to bed. The appellant was unable to recall Tammy's brothers coming to the house. He was also unable to recall Hartsfield banging on the door. He claimed that he slept until after 8:00 a.m. that morning when Tammy's sister and another friend informed him that the victim had been shot and he was a suspect. The appellant testified that he went to Jackson and stayed in a hotel

-7-

until the next day when he surrendered at the Gibson County Jail. The appellant denied possessing a weapon or shooting the victim. Although he acknowledged sharing a cell with Terry Lee at the Gibson County Jail, he denied telling Lee that he shot the victim. He further denied being a leader of the Gangster Disciples or shooting the victim for attempting to "get out of [the] gang."

In rebuttal, the State presented the testimony of Officer Kenneth Jones, Officer Jason Krause, and Sergeant Davis. Significantly, Officer Krause testified that although he was unable to recall seeing Tammy at the crime scene, he did observe her white Chrysler New Yorker. Sergeant Davis testified that she was certain she had seen Tammy at the crime scene.

Based upon the testimony at trial, the jury convicted the appellant of first degree murder, and the appellant was sentenced to life imprisonment.

State v. Phillip Lowell Bledsoe, No. W2006-02867-CCA-R3-CD, 2004 WL 1773433, at *1-6 (Tenn. Crim. App., at Jackson, August 9, 2004) (internal footnote omitted), perm. to appeal denied (Tenn. Nov. 29, 2004).

The Petitioner filed a petition for post-conviction relief on September 16, 2005. Following the appointment of counsel, he filed an amended post-conviction petition on February 27, 2009. The trial court entered an order denying post-conviction relief on May 6, 2009, and the Petitioner filed a timely notice of appeal.

**Post-Conviction Hearing.** At the March 23, 2009 post-conviction hearing, the Petitioner presented testimony from trial counsel and testified in his own behalf. The State presented testimony from District Attorney General Garry G. Brown.

Trial counsel testified that he was appointed to represent the Petitioner after the Petitioner dismissed his two prior attorneys. He stated that he was able to view the State's entire file on the Petitioner because of its open file policy. When asked if he reviewed a letter in the file written from the District Attorney to an earlier trial attorney regarding a prior gun incident involving the victim at the same club where the victim was later murdered, he stated, "I don't recall. I don't think I did." After reviewing this letter, trial counsel said that he did not recall the letter, but he did remember the information contained in the letter. He then stated that he did not remember being advised that he could receive more information about the prior gun incident involving the victim from Officer Tunning of the Milan Police Department. He acknowledged that he did not contact Officer Tunning about this information. However, trial counsel questioned the relevance of the information regarding

-8-

the victim's prior gun incident, given that two eyewitnesses saw the Petitioner shoot the victim.

Trial counsel stated that he was aware that Jerry Hartsfield had information regarding the Petitioner's case, but he was unsure whether the State would call him as a witness because Hartsfield had been charged with police misconduct in a different case. He admitted that he did not obtain records of Hartsfield's criminal charge of misconduct or of his pre-trial diversion documents for impeachment purposes. Instead, trial counsel said that he was prepared to impeach Hartsfield based on the general information he had of the misconduct. However, he admitted that if Hartsfield had not been truthful regarding his police misconduct, he would not have been able to impeach him without the records regarding his criminal charge. Trial counsel said that he was unsure whether he was going to impeach Hartsfield until after he heard his testimony at trial. He stated that he ultimately decided not to impeach Hartsfield at trial because he did not think that his testimony was damaging to the Petitioner. When asked if Hartsfield's testimony that he banged on the Petitioner's door and got no response was damaging to the Petitioner's case, he replied, "I don't know. I can't remember his testimony . . . [Hartsfield] testified [he] didn't get there until a certain time and . . . I couldn't tell if it was before or after [the time the Petitioner said he returned home for the night]." Trial counsel said that one of the reasons he did not impeach Hartsfield was that he could not determine whether his testimony was really at odds with the Petitioner's alibi. In addition, he said that he did not impeach Hartsfield because his police misconduct in the other case had to do with fabricating fingerprint evidence, which was not an issue in the Petitioner's case:

> Physical evidence wasn't an issue [in the Petitioner's case]. Two officers found the shell casing, gave it to [Hartsfield], he gave it to [Officer] Kenneth Jones who, you know, to my knowledge it never went any further than that. There was no testimony regarding fingerprints. No testimony regarding, you know, linking that shell casing to any murder weapon because there was no murder weapon.

When asked if he thought it would have been an appropriate line of questioning to assert that if Hartsfield had falsified fingerprint evidence in another case it was certainly possible that he had removed fingerprint evidence from the bullet casing recovered in the Petitioners' case, he responded, "It could've been [an appropriate line of questioning], but I didn't make it." Trial counsel explained that he "didn't go after Hartsfield in that manner, so [he] didn't bring it up to the jury." He also stated that he did not attempt to subpoena any of TBI's files regarding the investigation of Hartsfield's misconduct. He said, "I honestly didn't think [Hartsfield] would be a witness." He said that he was unaware at the time that Hartsfield was

given pre-trial diversion for his misconduct, which resulted in the destruction of the records from his criminal case.

When asked about the relevance of the gang references during trial, trial counsel responded:

> [T]he testimony came out that [the victim, as well as Tyrone Edwards and James Greg Cook] had all been in a gang, but [the victim] was trying to get out, and they all testified that you don't get out, [implying] that you're killed before you are allowed to get out. So our point – so the allegation[] was that, you know, these other two guys were in the gang that he was trying to get out of. They would have motive to do the killing rather than [the Petitioner].

Trial counsel said he did not file a motion in limine to keep the gang references out of the trial. He said that "it was common knowledge [in] the community that this [murder] was gang related[,]" especially since it had been "on the front page of the newspaper that this was a gang related murder."

Trial counsel acknowledged that when Hartsfield read the Petitioner's statement to police into evidence, it included the question, "Are you willing to take a polygraph," and the Petitioner's response, "Yes." When asked if he knew whether the Petitioner was actually given a polygraph test, trial counsel stated:

> I don't know. I mean, it was – he was asked if he would submit [while he was giving his statement to police]. He said, "Yes." Nothing further went on. So, in my mind if you offer a guy a polygraph test and he says he will [take it], you know he's pretty confident he's telling the truth. Nothing ever came up saying otherwise.

Trial counsel said that he did not recall Officer Kenneth Jones testifying that he contacted the Petitioner's prior trial attorney about the Petitioner taking the polygraph examination, and the Petitioner never agreed to take one after he retained an attorney. When asked if Officer Jones's testimony hurt the Petitioner's case, he stated, "Could have, just as easily as it could have reflected positively the other way." Trial counsel acknowledged that if he had filed a motion in limine regarding all references to the polygraph, it would have been kept out of the trial.

On cross examination, trial counsel stated that he did not impeach Hartsfield because Hartsfield's testimony regarding the Petitioner's statement was consistent with the Petitioner's alibi defense. He also asserted that the prior gun incident involving the victim

was not relevant because the evidence against the Petitioner did not support a claim of self-defense. Trial counsel also said that Hartsfield had not been convicted of any criminal offense at the time of the Petitioner's trial, so a judgment of conviction did not exist. He further stated that because there was no judgment of conviction, he would have had to impeach Hartsfield with a specific act of conduct and would have been unable to prove that act by extrinsic evidence.

Following direct and cross examination, the court then asked a few questions of trial counsel. When the court asked trial counsel if he explored other defense strategies with the Petitioner, like self-defense, trial counsel responded that the Petitioner was "adamant" about pursuing the alibi defense, and he never changed his mind. The court acknowledged that the Petitioner had a difficult time working with his two prior trial attorneys and asked trial counsel if he experienced difficulty with the Petitioner as well. Trial counsel replied that the Petitioner filed a bar complaint against him and had filed another bar complaint against a prior attorney who had represented him in this case.

The Petitioner testified that he and trial counsel never discussed alternate defenses in his case and never discussed all the evidence against him. He said that his alibi at trial was that he was at home at the time of the offense. The Petitioner said that Hartsfield took his fingerprints twice at the time when he was booked, and he informed his prior trial attorney that he thought it was unusual. However, he stated that he did not tell trial counsel that Hartsfield took his fingerprints twice because he did not believe it was relevant at the time. He said that he specifically asked trial counsel to discredit Hartsfield regarding his criminal charge of fabricating physical evidence. The Petitioner claimed that after Hartsfield asked him if he would take a polygraph examination, he was never given an opportunity to take the test. He said that trial counsel never talked to him about the pros and cons of taking the polygraph test.

District Attorney General Garry Brown testified that he was the District Attorney General for the Twenty-Eighth Judicial District and had been serving in that capacity since the year 2000. He said that some time after he was appointed District Attorney, he became aware that Jerry Hartsfield was charged with police misconduct. General Brown detailed the nature of the allegations against Hartsfield:

> [Hartsfield] submitted a fingerprint to the fingerprint examiner who worked for the Jackson Police Department and he indicated that that fingerprint was a latent print that had been removed from the trunk of an automobile, I believe, when, in fact, that print had been lifted from the defendant's fingerprint card.

He said that the Jackson Police Department examiner "could look at the print and tell that it was not a latent print, one, because it was perfect and, two, after it was further examined it was found that there was fingerprint ink . . . on what was supposed to be a latent print." General Brown said that Hartsfield was charged and indicted for the criminal offense of official misconduct and was ultimately placed on pre-trial diversion, which meant that he received no conviction for this offense. He said that if Hartsfield's credibility had been impeached, he felt he could have found witnesses that Hartsfield was credible at the time of the Petitioner's arrest and trial. General Brown also said that after the allegations against Hartsfield came to light, the District Attorney's office asked the West Tennessee Violent Crime & Drug Task Force to re-investigate the Petitioner's case. He said that the task force confirmed the facts found during Hartsfield's investigation of the Petitioner's case.

## ANALYSIS

In his appeal, the Petitioner argues that he received ineffective assistance of counsel because trial counsel (1) failed to pursue potentially exculpatory evidence, (2) failed to impeach Hartsfield's credibility based on his previous police misconduct, (3) failed to object to numerous references to the Petitioner's gang membership, and (4) failed to file a motion in limine, make an objection, or request a limiting instruction regarding all references to the polygraph examination. In response, the State argues that this court should affirm the denial of post-conviction relief because the Petitioner failed to prove his allegations of ineffective assistance of counsel by clear and convincing evidence.

The Petitioner contends that he received ineffective assistance of counsel. Post-conviction relief is only warranted when a petitioner establishes that his or her conviction is void or voidable because of an abridgement of a constitutional right. T.C.A. § 40-30-103 (2006). The Tennessee Supreme Court has held:

> A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal quotation and citations omitted). "The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence." Id. (citing T.C.A. § 40-30-110(f); Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006)). Evidence is considered clear and

convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing Hodges v. S.C. Toof & Co., 833 S.W.2d 896, 901, n.3 (Tenn. 1992)), perm. to appeal denied (Tenn. Nov. 2, 1998).

Vaughn further repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

202 S.W.3d at 116 (internal quotations and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Id. (citing Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697, 104 S. Ct. at 2069).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 370. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id. (quoting Strickland, 466 U.S. at 694, 104 S. Ct. at 2068).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689, 104 S. Ct. at 2065). Moreover, "[n]o

particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89, 104 S. Ct. at 2065. The Tennessee Supreme Court has reiterated:

> "Hindsight can always be utilized by those not in the fray so as to cast doubt on trial tactics a lawyer has used. Trial counsel's strategy will vary even among the most skilled lawyers. When that judgment exercised turns out to be wrong or even poorly advised, this fact alone cannot support a belated claim of ineffective counsel."

Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982) (quoting Robinson v. United States, 448 F.2d 1255 at 1256 (8th Cir. 1971)).

 **I. Failure to Discover Potentially Exculpatory Evidence.** The Petitioner contends that trial counsel was ineffective in failing to talk to Officer Tunning regarding the victim's prior possession of a gun at the same club where he was later murdered. He claims that this evidence would have supported a claim of self-defense at trial. However, this court has concluded that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990), perm. to appeal denied (Tenn. July 2, 1990). The presentation of the witness at the post-conviction hearing is the only way for the petitioner to establish:

> (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case,
> (b) a known witness was not interviewed,
> (c) the failure to discover or interview a witness inured to his prejudice, or
> (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.

Id.

 The only reference to this issue in the Petitioner's amended petition for post-conviction relief is an allegation that trial counsel failed to review prior counsel's file, which would have revealed a letter from the State to prior counsel regarding the victim's prior handgun incident at the same club where he was later killed. We note that post-conviction counsel did not place particular emphasis on this issue at the post-conviction hearing. Although there was some evidence regarding the State's letter to the Petitioner's prior

-14-

attorney regarding this evidence, the Petitioner's post-conviction counsel admitted that this issue was not one of the more viable issues at the post-conviction hearing. In reviewing the record, the post-conviction court did not specifically address this issue. However, the post-conviction court did generally find that "the petitioner . . . failed to show that any of the deficiencies alleged in his petition more probably than not affected the result of the trial."

Despite the Petitioner's claim that trial counsel rendered ineffective assistance in failing to discuss the victim's prior gun incident with Officer Tunning, the Petitioner failed to have Officer Tunning testify at the post-conviction hearing. See Black, 794 S.W.2d at 757. We further note that the Petitioner failed to include a copy of the relevant letter in the record on appeal. Regardless, the transcript from the post-conviction hearing indicates that the purported testimony would have been that the victim, in an entirely separate incident, possessed a gun outside the same club where he was later murdered. The Petitioner argues that the victim's possession of a gun outside the same club on a prior occasion somehow supports a self-defense argument. However, we conclude that the victim's possession of a gun during a separate incident has no bearing on whether he possessed a gun on the night that he was killed. Moreover, the transcript from the trial indicates that none of the witnesses at the scene testified that the victim possessed a gun the night he was killed. Even the Petitioner testified at trial on direct examination and cross examination that he was unsure whether the victim possessed a gun the night of his death. Furthermore, trial counsel testified at the post-conviction hearing that the Petitioner was "adamant" about using an alibi defense at trial. Accordingly, the Petitioner is not entitled to relief on this issue.

**II. Failure to Impeach Jerry Hartsfield.** The Petitioner contends that trial counsel was ineffective in failing to impeach the credibility of Hartsfield regarding his prior, unrelated incident of police misconduct. He also argues that trial counsel's failure to obtain the files regarding Hartsfield's criminal charges regarding this misconduct was ineffective, since Hartsfield was granted pre-trial diversion and the records regarding his criminal charge have since been destroyed pursuant to the pre-trial diversion statute. Finally, he claims that trial counsel was ineffective in failing to make the argument that Hartsfield, given the prior incident of police misconduct, could have easily removed another individual's fingerprints from the bullet casing recovered in this case, thereby exonerating the Petitioner.

In its order denying relief, the post-conviction court determined that the Petitioner failed to prove that trial counsel's failure to impeach Hartsfield's credibility "more probably than not affected the result of the trial." We agree. Trial counsel testified that he made a strategic decision to refrain from impeaching Hartsfield because he found that Hartsfield's testimony was not damaging because it was not inconsistent with the Petitioner's alibi defense at trial. Trial counsel also testified that he did not impeach Hartsfield because his police misconduct on the separate case involved fabricating physical evidence and there was

no physical evidence at issue in the Petitioner's case. In addition, General Brown testified that he had individuals from the Violent Crime and Drug Task Force reinvestigate the Petitioner's case, and the task force's findings were the same as Hartsfield's findings in this case. We will not question trial counsel's strategy regarding his decision not to impeach Hartsfield. See Hellard, 629 S.W.2d at 9. The Petitioner is not entitled to relief on this issue.

**III. Failure to Object Regarding References to Petitioner's gang membership.** The Petitioner argues that trial counsel erred in failing to object to the mention of the word "gang" at trial and failed to object to testimony suggesting that the Petitioner was a member of a gang.

In its order denying relief, the post-conviction court noted that "some of the proof indicated that the motive for the killing was that the victim was in the same gang with the [Petitioner], that the victim wanted out, and that the [Petitioner] and his associates did not wish to allow the victim to leave the gang." The court then determined that "it does not appear that 'gang' references could have been eliminated from the testimony." The court found that the Petitioner failed to establish that counsel's actions "more probably than not affected the result of the trial." We agree. The evidence presented against the Petitioner at trial was overwhelming. Two eyewitnesses testified that they saw the Petitioner shoot and kill the victim. Moreover, the record shows that one of the Petitioner's defenses at trial was that Tyrone Edwards and Greg Cook had motive to kill the victim either because the victim was trying to get out of the gang to which they belonged or was a member of an opposing gang. The Petitioner is not entitled to relief on this issue.

**IV. Failure to file a Motion in Limine, or Make an Objection, or Request a Limiting Instruction Regarding References to a Polygraph Examination.** The Petitioner contends that trial counsel erred in failing to file a pre-trial motion in limine to prevent references regarding the polygraph examination from coming into evidence. He further argues that trial counsel failed to object or ask for a limiting instruction after evidence regarding the polygraph examination was admitted into evidence.

During the State's proof, Hartsfield read Bledsoe's statement to police that included an offer for the Petitioner to take a polygraph examination and the Petitioner's response that he would be willing to take a polygraph test. A bench conference was held immediately following Hartsfield's direct examination wherein the State agreed that it would not ask any further questions about the polygraph or discuss the polygraph any further during trial if the defense agreed not to discuss the issue any further. The trial court stated that if the defense mentioned anything about the polygraph, this would open the door for the State to present testimony that the Petitioner was later given an opportunity to take the polygraph test and did not ultimately take it. During cross examination, the Petitioner testified that Hartsfield did

not give him a chance to read his statement before signing it since the Petitioner had said he was going to take a polygraph examination. He also testified that Officer Kenneth Jones never offered him a polygraph examination and that he never refused to take the test. As a consequence, the trial court allowed the State to present rebuttal testimony from Officer Jones, who stated that he later asked the Petitioner's attorney at the time if the Petitioner would, in fact, be willing to take a polygraph. Officer Jones testified that he never heard a response from the Petitioner's attorney and that the Petitioner never actually took the polygraph examination.

In its order denying relief, the post-conviction court found that "any request for limiting instructions after the testimony to the effect that Bledsoe did not take a polygraph would have simply emphasized that fact to the jury." It further found that trial counsel's alleged deficiency in this regard did not "more probably than not affect the result of the trial." We agree. However, we note the Tennessee courts have uniformly held that "polygraph evidence is inherently unreliable, and therefore irrelevant and inadmissible." State v. Pierce, 138 S.W.3d 820, 826 (Tenn. 2004) (citing State v. Torres, 82 S.W.3d 236, 252 n.20 (Tenn. 2002); State v. Irick, 762 S.W.2d 121, 127 (Tenn. 1988); Grant v. State, 374 S.W.2d 391, 392 (Tenn. 1964); Marable v. State, 313 S.W.2d 451, 456 (Tenn. 1958); State v. Campbell, 904 S.W.2d 608, 614-15 (Tenn. Crim. App. 1995)). Although we recognize that, given the content of the Petitioner's statement to police, it would have been appropriate for trial counsel to file a motion in limine to prevent any reference to the polygraph examination at trial, we do not conclude that the references to the polygraph admitted into evidence affected the result of the Petitioner's trial. Moreover, once the issue of the polygraph was mentioned at trial, it was reasonable for trial counsel to make the tactical decision not to request a limiting instruction, since such an instruction could have merely emphasized either the Petitioner's failure to take the polygraph or the possibility of an unfavorable polygraph result in the jury's mind. See Strickland, 466 U.S. at 688-89, 104 S. Ct. at 2065. The Petitioner is not entitled to relief on this issue.

Because the evidence does not preponderate against the findings of fact of the post-conviction court, this court is bound by those findings. We conclude that the Petitioner failed to prove by clear and convincing evidence that trial counsel provided ineffective assistance. Accordingly, the Petitioner is not entitled to relief on this issue.

**Conclusion.** Upon review, we affirm the judgment of the post-conviction court.

_____
CAMILLE R. McMULLEN, JUDGE